STEPHEN J. HALLAHAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ARTHUR K. POPE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

FRANCIS S. SNOW, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HOLTEN B. PERKINS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 6848–6851. Promulgated December 6, 1928.

*John N. O'Donohue, Esq.*, and *John F. Malley, Esq.*, for the petitioners.

*Dwight H. Green, Esq.*, for the respondent.

586

589

590

**OPINION.**

SMITH: In filing their income-tax returns for the years 1917, 1918, 1919, and 1920, each of the petitioners excluded the payments made to the estates of Arthur B. Gilmore and William T. Ulman in computing the amount of partnership income available for distribution to themselves, whereas the respondent, for each of those years, added to the amount of net income reported by the partnership the amounts paid to the estates of Gilmore and Ulman and included in the gross income of each of the partners a proportionate part of such amounts.

The petitioners insist that the payments made to the estates represented partnership profits, the two estates having a right to participate in earnings of the partnership during those years and that the amounts paid were not distributable to partners as profits in the partnership.

The agreement of November 30, 1907, creating the partnership of Gilmore, Pope and Ulman, contained the following provisions:

Ninth, In case of the decease of any one of the partners the two surviving partners shall have an option upon the share or interest in the partnership of the deceased partner, and the price to be paid therefor shall be the proportionate share of the deceased partner in the profits of the business for the three years succeeding the date of his decease, or at their option a cash payment equivalent thereto if the same can be determined upon by the survivors and the legal representatives of the deceased. Said option shall be exercised, if at all, within sixty days of said decease.

Tenth, Upon the decease of one of the partners, in case said option shall not be so exercised or the termination of the partnership from any other cause, a true and perfect account of all matters connected with said partnership shall

be made, and the expenses, leases, profits and partnership assets shall be divided between the partners in the same proportions as at that time shall govern the division of any profits.

These provisions were ratified and continued in force by the agreement of April 1, 1910, under which Alfred M. Bullard was admitted to the partnership, and they were in effect at the time of the deaths of the two partners, Gilmore and Ulman, in December, 1916. They were also ratified and continued in effect by the new partnership agreement of February 10, 1917.

Upon the death of Gilmore and Ulman the old partnership stood dissolved. The surviving partners and the estates of the two deceased partners were the owners of the partnership assets. Each had a right to demand an accounting and a distribution of the assets, but such action' would have destroyed to a large extent the value of the main asset of the partnership, which was its life as a going business. It was manifestly to the interest of the parties to effect some arrangement whereby this asset would be conserved. It was also realized that the business could not continue without the acquisition of new partners to give the personal services formerly rendered by the two deceased partners.

To meet this situation a new partnership was formed under the agreement of February 10, 1917, which consisted of Pope, Bullard, Snow, Hallahan, and Perkins. The two first named contributed to this new partnership their interests in the partnership assets of the old firm, together with their services, and the three last named contributed their services. The estates of the deceased partners, Gilmore and Ulman, through their representatives, who participated in the arrangement, contributed to the new partnership their interests in the assets of the old partnership under an agreement whereby each estate was to share in the profits of the new partnership to the extent of 22⅔ per cent each for the three calendar years 1917, 1918, and 1919, it being understood and agreed that they were not parties to the partnership agreement as such and assumed no liability thereunder. These two estates were also paid the amounts which the two deceased partners had contributed to the cash capital of the old partnership.

These two estates were not parties to the agreement of February 10, 1917, but the proof shows that they actually participated through their executors in the arrangement made, and the latter executed on the same day a written acknowledgment of their agreement to the arrangement effected and following this they accepted and were paid the specified proportion of the profits of the business for the years 1917, 1918, and 1919.

The partnership agreement of February 10, 1917, and the agreement made with the partnership by the executors of the two estates

did not result in the creation of a partnership relation as to those estates in view of the expressed intention of the parties that no such relationship should exist, and it is admitted by all of the parties to the proceedings before us that at no time was either of the estates a partner in the firm of Cyrus Brewer & Co.

It is insisted by the petitioners that the option given surviving partners to purchase the interest of a deceased partner was not exercised and could not be exercised, as it was conditional upon the death of one partner and could only be exercised by the remaining partners in the continuance by them of the partnership. They contend that the death of two partners created a condition which made the exercise of the option impossible.

However, it is not necessary to determine whether or not the option in question could have been exercised, as we are of the opinion that the settlements made with the estates of the two partners were occasioned by and were in substantial accord with the provisions of the several partnership agreements relative thereto. Even should it be considered that the agreement with the estates was an undertaking of the surviving general partner, Pope, and special partner, Bullard, and the three new partners, Snow, Hallahan, and Perkins, who constituted the new partnership of Cyrus Brewer & Co., our decision with respect to the relationship of all parties concerned would not necessarily be altered thereby.

We have previously held in *Willard C. Hill et al.*, 14 B. T. A. 572, which case presented substantially the same agreement as the one here under review, that the agreement therein considered provided for the sale of the interest of a deceased partner to the surviving partners; that the transaction constituted a purchase of capital assets, and that there should be included in the net income of each surviving partner his distributive share of all amounts paid in accordance with the terms of the partnership agreement to the estate of a deceased partner. In the instant case we are convinced that the intention of all parties concerned, including the parties to both the old and new partnership agreements, was to prevent an accounting and distribution upon dissolution of the partnership, which action would have been less beneficial to all of them and which would have prevented the estate of a deceased partner from getting out of the partnership the real value of the deceased partner's interest. Consequently, we hold that here the partnership agreements under review and the separate agreement made with the new partnership and the executors of the estates of Gilmore and Ulman constituted a sale of the interests of the two estates to the new partnership.

The net income of a partnership, under all the revenue acts, is to be computed in the same manner and on the same basis as in the

case of an individual, and in the case of an individual it is provided that in computing net income there shall be allowed as deductions all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered. Since the payments made to the estates of Gilmore and Ulman obviously are not deductible expenses, they must be included in the net income of the partnership available for distribution.

It is contended, however, that the payments to the two estates consisted of profits paid to them as such and that the petitioners were not and should not be held liable to income tax in respect thereof. Relative to this position of petitioners we said, in *Willard C. Hill et al.*, *supra:*

> * * * The profits of a partnership belong to the partners. They may choose to make any disposition which they wish of such profits. They may bind themselves to pay over those profits or a portion of them for the acquisition of a capital asset. We think that no valid claim may be made that the partners are not liable to income tax in respect of their shares of the partnership profits merely because by an agreement voluntarily entered into they have bound themselves to pay those profits for the acquisition of such capital asset. A partner may not avoid the income tax under an agreement by which his share or a portion of his share of the profits of the partnership are to be paid to the estate of a deceased partner in the acquiring of such deceased partner's interest in the assets of a prior partnership.

The amounts distributable to the partners who participated in partnership profits on a percentage basis, namely, Pope, Snow, Hallahan, and Perkins, were computed by the respondent in accordance with the following percentages:

|  | Per cent |
|---|---|
| Arthur K. Pope | 41. 46 |
| Francis S. Snow | 24. 24 |
| Stephen J. Hallahan | 22. 20 |
| Holten B. Perkins | 12. 10 |
|  | 100. 00 |

The foregoing percentages were determined by considering the whole amount available for distribution to the partners as being equal to 100 per cent of the net income of the partnership and adding to the percentages specified in the partnership agreement of February 10, 1927, that figure which would result in the same relationship among the partners on the basis of 100 per cent as resulted under the partnership agreement on a basis of 54⅔ per cent, that is, the formula employed in each case was as follows: The percentage provided for in the partnership agreement bore the same relation to 54⅔ per cent as the percentage employed by the respondent in computing the deficiency bore to 100 per cent.

With this method employed by the respondent we can not agree. An examination of the history of Cyrus Brewer & Co. reveals the fact that the interest therein of Arthur W. Pope and, subsequent to his death, that of his estate, was from the beginning greatly in excess of that of any other partner, and the partnership agreement of February 10, 1917, clearly indicates that the business, at least up until December 31, 1919, was considered by all to be principally that of Pope, inasmuch as that agreement provided for the major portion of the business, namely, the name and good will of Cyrus Brewer & Co., the lease, physical property and records were to go to him and that Snow, Hallahan, and Perkins were to receive only the brokerage accounts on which each had received a commission during the last year that the old partnership was in existence. It is further noted that the partnership entered into under the agreement of February 10, 1917, terminated coincident with the expiration of the three-year period that payments were to be made to the estates of Gilmore and Ulman. While there was no direct evidence on this point, we are convinced that the interest of the two estates in the old partnership which were purchased by the new partnership ultimately went to Pope and that, considering the effect of the agreement of February 10, 1917, as a whole, the interest of Snow, Hallahan, and Perkins in the partnership which terminated December 31, 1919, was limited to ownership of the brokerage accounts on which each received a commission on the 1916 books. Consequently, we are of the opinion that the net income of the partnership for income-tax purposes should be distributed as follows:

|  | Per cent |
|---|---|
| Pope | 68.00 |
| Snow | 13.26 |
| Hallahan | 12.13 |
| Perkins | 6.61 |
|  | 100.00 |

Arthur K. Pope, one of the petitioners, assigns error on the part of respondent in including as a part of his taxable income for the years 1917, 1918, 1919, and 1920, that portion of the profits received by him in these years from the partnership of Cyrus Brewer & Co. which he in turn paid over to his mother and brother under an agreement made with his father, from whom he received his original partnership interest, that he would hold the same in trust for the latter's estate.

The father of this petitioner originally owned the interest in the old firm of Cyrus Brewer & Co. now represented by the interest of this petitioner in the present firm. The petitioner received this interest under an agreement to hold it in trust for the estate of his

father and the latter died intestate, leaving a widow, a minor son, and petitioner as his surviving heirs. The record shows that this agreement has been acted upon and given effect continuously since the death of the father, the petitioner each month paying over to his mother and brother an agreed and definite portion of the profits received by him from the partnership.

Respondent takes the position that the transaction was in effect an assignment by petitioner of a portion of his income and accordingly the total amount is taxable to him individually under the rule laid down in *Ormsby McKnight Mitchel*, 1 B. T. A. 143, as approved in *Mitchell* v. *Bowers*, 9 Fed. (2d) 414. In this respondent has overlooked the fact that petitioner's mother and brother did not receive their interest in the share of the partnership standing in the name of petitioner from the latter, but inherited it from Arthur W. Pope. Petitioner received that interest under an express agreement to hold it in trust for the estate of his father. He and his mother and brother were the sole heirs and entitled to the estate. The authorities are uniform that in the case of property, title to which is taken under an express agreement to hold in trust for one or more beneficiaries, an express trust is created and the one in whose name the property stands is no more than a trustee. *Odell* v. *Moss*, 70 Pac. 547; 137 Cal. 542; *Gritten* v. *Dickerson*, 66 N. E. 1090; 202 Ill. 372; *Newman* v. *Schwerin*, 109 Fed. 942; *Craig* v. *Harless*, 76 S. W. 594; 33 Tex. Civ. App. 257; *Rice* v. *Rice*, 65 N. W. 103; 107 Mich. 241; *Wilkinson* v. *Stitt*, 56 N. E. 830; 175 Mass. 581.

This petitioner, under the rule stated, is, as to the interests of his mother and brother in the parnership interest passing to him on his father's death, merely a trustee and any profits distributed to him are received in trust to the extent of their interests just as any other income of trust property is received. He has no beneficial interest in them. He has surrendered no interest when he pays them over to his mother and brother and the latter did not receive them as the result of an agreement made by them with petitioner. Their rights accrued as heirs of Arthur W. Pope and their agreement with petitioner as to the proportionate amounts to be paid over to them was but an incident in the performance of the trust assumed by petitioner. The rights of the parties in interest to determine an equitable division can not be questioned.

Can it be said, merely because they are profits upon a partnership interest standing in petitioner's name, that they are distributable to him and must be included in the net personal income upon which he individually must pay a tax? We have had substantially this same situation presented to us before and have drawn definitely the distinction between those cases of which *Ormsby McKnight Mitchel,*

*supra*, is an example, where the beneficial interest in the income alone has been assigned by the party owning the corpus, and those in which the income is produced by property belonging to two jointly, although the ownership of only one was disclosed and the total income actually collected by that party, who then accounted to his undisclosed copartner in interest for the latter's share. In these cases we have held the individual receiving the total income taxable on only the portion in which he individually had the beneficial interest, the portion paid his associate being merely received by him in trust for such party. *C. R. Thomas*, 8 B. T. A. 118; see also *William W. Parshall*, 7 B. T. A. 318; *Ralph L. Hinckley*, 6 B. T. A. 312; *Harry P. Kelley*, 9 B. T. A. 832.

In accordance with the foregoing, we hold that one-half of petitioner Arthur K. Pope's distributive share of the profits of Cyrus Brewer & Co. should not be included in his taxable income.

The deficiency will be redetermined in accord with the foregoing findings of fact and opinion.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

TRUSSELL, dissenting: I am unable to agree with that portion of the majority opinion and decision holding that the percentages of net profits actually distributed to the estates of Gilmore and Ulman must be treated for the purposes of the enforcement of income-tax liabilities as partnership profits distributable to Arthur K. Pope, and I am also in disagreement with the determination of the respondent holding that these same percentages of profits should have been treated as partnership profits distributable to the four petitioners herein in the proportions set forth in the respondent's deficiency notices.

As I read it, the record of this action clearly establishes that on or about February 10, 1917, the four petitioners herein named, together with one Alfred M. Bullard and the representatives of the estates of Arthur B. Gilmore and William T. Ulman, entered into a business agreement by virtue of which they all agreed to participate in the carrying on of a general insurance agency business under the name and style of Cyrus Brewer & Co., and to continue said business from January 1, 1917, to December 31, 1920. Toward the carrying on of this business the two estates and the four petitioners contributed an office leasehold and such office equipment as is commonly required by a concern carrying on a fire insurance agency business. Arthur K. Pope contributed his interest in the good will of the name of Cyrus Brewer & Co. which he had inherited from his father in June, 1905. Arthur B. Gilmore had come into a prior partnership upon an agreed

basis with petitioner Pope upon payment to the estate of the elder Pope of a cash consideration of $9,000, and thereupon petitioner Pope and the said Gilmore participated equally in the profits of the then organization of Cyrus Brewer & Co. In 1907 William T. Ulman came into that organization, whereupon the interests were modified so that Pope and Gilmore were entitled to 37½ per cent each and Ulman to 25 per cent of the gains and profits. In 1910 Alfred M. Bullard was taken into this organization as a special partner contributing the assets and insurance business theretofore conducted under the name and style of A. M. Bullard & Co., and the organization agreed to pay said Bullard the sum of $6,600 per year so long as the agencies constituting the assets of his contributed business were not withdrawn.

The record of this action further establishes that the insurance agency business is a business of personal service and that any person connected with an insurance agency organization over a period of years by virtue of the intimate knowledge which he obtains through the solicitation of business, the adjustment of losses, and all his contact with purchasers of insurance protection, builds up for himself a personal good will and that upon the withdrawal of such person, either by death or otherwise, from the organization with which he has been connected, such personal good will is a continuing factor in the getting of business, and that custom has established that such personal good will has a capital value for a period of approximately three years after the withdrawal or death of the person creating it and that at the end of such period of three years any capital value of that personal good will ceases to exist as a recognizable factor in the getting of insurance business.

Arthur B. Gilmore had been connected with the predecessor organization since prior to 1905; William T. Ulman had been connected with this prior organization since 1907. In the business agreement of February 10, 1917, all the facts herein above outlined, together with the established customs of the insurance agency business, were duly recognized and thereupon the estates of Arthur B. Gilmore and William T. Ulman, through their legal representatives, contributed to the continuing organization the personal good will of the deceased limited to the period of three years.

The previously existing arrangements with Alfred M. Bullard were continued and Pope, Hallahan, Snow, and Perkins contributed to said business by virtue of said agreement their personal services and thus were made up the total of the capital elements and personal services contributed to the business to be conducted under the business agreement of February 10, 1917.

The record further shows that there were distributed to the two estates by the organization thus created, in addition to the shares of

profits agreed to be paid them for the three years in question, the capital interests of those estates in the tangible assets, and it can not be said, in my opinion, that there remained after the period in question any asset, tangible or intangible, in the possession or owner-ship of these petitioners representing an interest formerly belonging to Gilmore or Ulman or their estates.

When men make agreements for the carrying on of a business in which profits are anticipated, they provide for the distribution of such profits to the persons or the estates contributing business-getting elements to such business. This is what was done in the instant cases. No one purchased or agreed to purchase the contributions of others; they only agreed to divide the gains and profits in a ratio deemed by them to be proportionate to the contributions of each contributor, whether as general partners, special partners, or as in these actions the estates of former associates, and the relations with respect to gains and profits, as established by the agreement, fixed the rights of all the contributors and during the period of the continuance of said agreement no one of these contributors received or had any right to receive any quantum of gains and profits other than the amount fixed by the agreement. The United States in its capacity as a sovereign levying and collecting income taxes is not now and never has been endowed with authority either to modify or ignore the established, fixed and lawful agreements of men engaged in carrying on a busi-ness which produces or is capable of producing taxable income, unless or until it shall be established that such agreements necessarily result in the escape of some part or all of taxable income from bearing its just share of Federal taxation, and no indication of such result can be discerned in the record before us. The agreement has not been hidden and a mere glance at its provisions will disclose to any tax-enforcing official where he can find the persons subject to the tax and the amounts of the gains and profits received or distributable to each of such persons.

A situation similar in many respects to the one here presented was before us recently in *James Brown*, 10 B. T. A. 1036. In that case one member of a partnership died on April 2, 1920. The articles of partnership provided that in such cases the estate of the deceased member should be paid his proportionate share of the profits of the business for the balance of the year in which the death occurred and the salary to which he would have been entitled for services rendered during that period had he lived, and that at the close of the year his estate should be paid his capital interest less his interest in the name and good will of the business, the last named asset remaining the property of the surviving partners. This provision of the articles of partnership was carried out and, in determining the distributive

shares of the remaining partners in the profits of the partnership for that year, we held that the sums paid the estate representing profits and salary for the period from the date of death to the close of the taxable year should be excluded. In that case we said:

The profits of the partnership to which the surviving partners were entitled were not the total profits, but the total profits less the amount which all agreed should go to the estate of a deceased partner. There was not, therefore, receipt by these surviving partners of the total profits and then a distribution to the estate, but they were entitled in the first instance to receive only their share of the partnership profits and the remainder was a share of the profits which accrued to the Delano estate.

However, the question, in my opinion, goes further than this and the liability of the partners, for tax upon the total profits of that partnership would not be determined by a showing that capital assets were contributed by the two estates under an agreement whereby those estates would receive a certain proportion of the net profits for a fixed period, without becoming partners, and without a capital interest distributable to them at the termination of that period.

The fact that a partnership relation does not exist because the intention of the parties is to the contrary does not preclude the making of an agreement whereby one not a partner shares in the profits of a partnership. As the court said in *London Assurance Co.* v. *Drennan*, 116 U. S. 461:

Persons cannot be made to assume the relation of partners as between themselves, when their purpose is that no partnership shall exist. There is no reason why they may not enter into an agreement whereby one of them shall participate in the profits arising from the management of particular property without his becoming a partner with the others, or without his acquiring an interest in the property itself so as to effect a change of title.

The rights of the estates under this agreement were to receive *profits alone* and to receive these *as such.* If there were no profits they would be entitled to nothing. No obligation was placed upon petitioners by the contract to pay any specified amount. It is not thought questionable that the estates under this arrangement could maintain against the partnership a suit for an accounting of the profits. *Coward* v. *Clawton*, 55 Pac. 147; 122 Cal. App. 451; *Clark* v. *Pierce*, 17 N. W. 780; 52 Mich. 151; *Hallet* v. *Cumston*, 110 Mass. 32.

Under such circumstances, can it be said that these profits, to which the estates were entitled by the formal agreement made, were distributable to the partners? I think not. I can not accept a theory holding that profits are distributable to and constitute a portion of the individual taxable income of a partner upon facts which show that such profits were not only never received by him, but that he had at no time a beneficial or other interest in them and that the right

to receive and the beneficial interest was at all times in other parties to whom they were actually distributed.

In the case of *R. E. Thompson* v. *Commissioner of Internal Revenue*, 28 Fed. (2d) 247, the court held that where a partnership sold certificates entitling the holders to a share in its future earnings, the certificate holders did not become partners, nor did they obtain under the terms of the certificates a capital interest in the partnership assets, but were during the period of participation the beneficial owners of the money which they contributed, and the relation created was one of agency on the part of the partners, to manage the property, and that the money paid in by the certificate holders was capital in so far as the partnership was concerned and the profits distributed to them were the earnings of such capital.

In the present case, if the conclusion of fact in the foregoing opinion that the two estates contributed capital assets for which they were to receive a proportion of the earnings of the partnership, is correct, the condition would be analogous, in that respect, to the one presented in the cited case, as the partnership did not take title to those assets upon the conclusion of that arrangement, for the agreement provided for the participation by the two estates in the earnings of the partnership as thereby constituted, and the partners in the new firm had no right of alienation, as to these assets, during the period of participation in earnings by the two estates.

The effect of the decision in the present case is that where one acquires property from another, who reserves, however, the income therefrom for a certain period, the one acquiring the property, although he does not receive the income during that period and at no time had a right to receive it, is nevertheless considered, for income-tax purposes, as having actually received it and his taxable income is to be increased to that extent.

A situation in many respects similar to the one in the case at bar was recently before the United States District Court for the Western District of Louisiana in the suit of *Frank J. Looney* v. *United States*, 26 Fed. (2d) 481. In that case the plaintiff and another party had both claimed the right to drill for oil on a certain property and the dispute had been settled by an agreement whereby plaintiff received all rights in the property belonging to such other party and in consideration of the transfer the latter was to receive $200,000 to be paid out of the oil produced from the property. The $200,000 was so paid and in determining plaintiff's income-tax liability the Commissioner had included such amount as income received by him, treating, as he had done in the case before us, the purchase by plaintiff of the other party's rights as a capital transaction and similar in all respects to one in which he had received the full return from the

property and then paid the sum in question for the interest conveyed to him. The court in its opinion, after distinguishing those cases in which one possessed of a right to receive income directs that it be paid another, said:

> However, I do not think the situation is different to what it would have been had the firm of Foster, Looney & Wilkinson purchased a valuable building and in doing so agreed that the vendors should receive the rents of 1921, either as a part of the purchase price or in settlement of some adverse claim against the said building. In either event, their right to receive and enjoy the whole revenues would have been reduced just so much and being so reserved, would never have passed to the purchasers' income. In other words, both in the illustrated instance and in the case at hand, I think the result was to convey the property subject to the right on the part of the vendors to take the revenues to the extent indicated and that they would not and did not pass to Foster, Looney & Wilkinson as income, for which they were bound to account.

I think the reasoning of the court in the above case is correct. The theory of the majority opinion in the present case, and the conclusion reached is, in my opinion, unsound.

SIEFKIN agrees with this dissent.