RAYMOND L. ALLEN and SHIRLEY L. ALLEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent SPORTCRAFT HOMES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Allen v. Commissioner
Docket Nos. 8114-71, 8210-71
United States Tax Court
T.C. Memo 1975-39; 1975 Tax Ct. Memo LEXIS 333; 34 T.C.M. (CCH) 242; T.C.M. (RIA) 750039; February 27, 1975, Filed Michel G. Emmanuel and Michael D. Annis, for the petitioners. W. P. White, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies and penalties against Raymond and Shirley Allen for the following years: [1] Section 6653(a) Calendar Year
Deficiency
Penalty
1967
$ 24,209.27
$ 1,210.46
1968
2,014,056.46
100,702.82
1969
115,325.21
5,766.26
Total
$2,153,590.94
$107,679.54
*335 Respondent determined the following deficiencies and penalties against Sportcraft Homes, Inc., in the following years: Fiscal Year
Section 6653 (b) Ended
Deficiency
Penalty
June 30, 1967
$163,701.75
$ 81,850.88
June 30, 1968
534,217.37
267,108.68
August 27, 1968
100,175.70
50,087.85
Total
$798,094.82
$399,047.41
Respondent has confessed error regarding his imposition of the negligence penalties determined against the Allens and the fraud penalties determined against Sportcraft Homes, Inc. During the course of the trial the parties settled numerous issues, leaving the following issues to be resolved herein: 1. Whether the 1964 transaction in which the Allens purported to sell their stock in certain corporations to Bishop Reicher constituted a sale for purposes of section 1222 (3). 2. Whether the 1968 transaction in which the Allens sold their contract right against Bishop Reicher to National Homes Corporation constituted the sale of a capital asset. 3. Whether the value of National Homes stock placed in escrow pursuant to *336 the terms of the Agreement among the Allens, National Homes and others constitutes income to the Allens in the year the escrow was established. 4. What deductible expenses were incurred by the Allens in 1968 and 1969 in connection with the operation of the Runaway Bay Club? 5. Whether rent accrued by Sportcraft Homes, Inc., for the fiscal years ended June 30, 1967, June 30, 1968, and August 27, 1968 is deductible. FINDINGS OF FACT [2]
Some of the facts have been stipulated by the parties and are found accordingly. The petitioners Raymond and Shirley Allen ("the Allens"), husband and wife, resided in Florida at the time they *337 filed their petition. They filed their joint Federal income tax returns for the calendar years in issue with the district director in Jacksonville, Florida. They utilized the cash basis method of accounting. Petitioner Sportcraft Homes, Inc. ("Sportcraft Homes"), a Florida corporation, maintained its principal place of business in Clearwater, Florida at the time it filed its petition. It filed its corporate income tax returns for the taxable years ended June 30, 1967, June 30, 1968 and August 27, 1968 with the district director in Jacksonville, Florida. Sportcraft Homes used the accrual method of accounting. Beginning in the early 1950's and continuing through the years in issue, the Allens were active in the travel trailer and mobile home manufacturing business. As a result of his extensive experience with the industry, Raymond Allen ("Ray Allen") became optimistic about the future. In order to participate in the anticipated future growth of the industry, he actively expanded his mobile home manufacturing operations through various entities under his control. By 1964, Ray Allen had established plants strategically located in Florida, California and Arizona. Two Florida plants *338 were operated by Sportcraft Trailer Manufacturing, Inc. ("Sportcraft Trailer"), a Florida corporation. A California plant was operated by Sportcraft Trailer's wholly-owned subsidiary, Sportcraft Trailers of California, Inc. ("Sportcraft California"), and an Arizona plant by Sportcraft Trailer's other wholly-owned subsidiary, Sportcraft of Arizona, Inc. ("Sportcraft Arizona"). Also, at this time Shirl-Ray Corporation ("Shirl-Ray"), a Florida corporation, operated a mobile home manufacturing plant (Parkwood Homes) in Clearwater, Florida. The Allens owned all the stock of both Sportcraft Trailer and Shirl-Ray. Sportcraft Trailer reported the following amounts of taxable income in the following years: Taxable Year Ended
Taxable Income
September 30, 1961
$ 62,838.32
September 30, 1962
118,204.90
September 30, 1963
122,149.88
April 17, 1964
128,285.25
Shirl-Ray was not only active in the mobile home manufacturing business through its ownership and operation of the Parkwood Homes plant, but also owned certain real estate. Shirl-Ray reported the following amounts of taxable income in the following years: Taxable Year Ended
Taxable Income
October 31, 1962
$ 7,742.47
October 31, 1963
39,082.33
April 17, 1964
82,330.65
*339 Allen Sales Corporation ("Allen Sales") was incorporated in Florida in 1957. From its inception all its stock was owned by the Allens. This corporation functioned as a sales arm or distributor for Sportcraft Trailer until it was dissolved in September 1963. After this dissolution, the profits that had formerly been received by Allen Sales were received by Sportcraft Trailer. Allen Sales reported the following amounts of taxable income in the following years: Taxable Year Ended
Taxable Income
September 30, 1961
$ 5,618.46
September 30, 1962
32,002.11
September 30, 1963
23,601.97
Sportcraft California was engaged in the trailer manufacturing business; its plant was located in Hemet, California. Sportcraft California reported the following amounts of taxable income in the following years: Taxable Year Ended
Taxable Income
January 31, 1963
($49,928.47)
January 31, 1964
67,313.29
April 17, 1964
17,953.22
Sportcraft Arizona was primarily engaged in the manufacture of mobile homes; its plant was located at Tempe, Arizona. Sportcraft Arizona reported the following amounts of taxable income in the following years: Taxable Year Ended
Taxable Income
September 30, 1962
$54,868.33
September 30, 1963
70,870.36
April 17, 1964 [3]/
(8,273.32)
*340 As the size of mobile homes grew, it became impractical to ship them very far. There developed a rule of thumb that because of shipping cost a manufacturing plant should be within about 250 miles of its prime market areas. The fastest growing market areas in the early 1960's were Florida, Arizona and California. Consequently, there was a decided trend among the existing manufacturers to establish plants in these areas. In addition, companies which had not previously been engaged in the mobile home business were seeking to enter the industry in those areas. Mobile home manufacturing requires skills which are unlike those of conventional home builders, but more analogous to the assembly-line production methods used in the automobile industry. At least in Florida, the pool of workers skilled in assembly-line production techniques was not great in 1964. This presented a problem for any potential competitors trying to locate in the area. Sportcraft Trailer and its subsidiaries *341 had established plants in all three of the key states. They were in a good position to benefit from the anticipated boom in the mobile home industry. Furthermore, Sportcraft Trailer enjoyed an excellent reputation in the mobile home industry: its products were widely respected and highly desirable; dealers wanted to be franchised by it; and over a period of more than a decade it had established a trained labor pool and had been able to attract some employees of exceptional ability. The intangible assets of a mobile home manufacturer are frequently more important in determining its value than are its fixed assets. The intangible assets owned by Sportcraft Trailer in 1964 included: (1) excellent management personnel; (2) a trained labor pool; (3) a good dealer organization; (4) a superior reputation; (5) geographically well located plants; (6) designs and drawings for trailers; (7) a close and personal relationship with suppliers; (8) going concern value as a company with an established market; and (9) well-recognized trade names. In 1963 Ray Allen met Bernard J. Lechner ("Lechner"), an attorney and certified public accountant from a Chicago, Illinois accounting firm. Ray Allen was *342 favorably impressed with him and persuaded him to accept employment with Sportcraft Trailer. Lechner assumed responsibility for the financial management of Sportcraft Trailer, its subsidiaries and Shirl-Ray. He also furnished personal tax, legal and financial advice to the Allens. Although the Sportcraft group of mobile home manufacturing corporations was quite profitable and possessed a potential for growth, in 1963 it was experiencing financial difficulties because of a shortage of working capital. In an effort to alleviate this problem, officers of the corporation tried to borrow additional money from various bankers. After these efforts proved unsuccessful, one of the bankers placed an advertisement in the Wall StreetJournal sometime during 1964 seeking help for Sportcraft Trailer and the related corporations. The advertisement in the Wall Street Journal produced an inquiry from Robert M. Bernstein ("Bernstein"). Lechner responded to Bernstein's inquiry and found that Bernstein had made a blind reply, but that he might be able to arrange a transaction, either a loan or sale, with any of several individuals or organizations, including a taxexempt organization. While *343 Ray Allen also spoke to Bernstein, Allen left all of the negotiating to Lechner. Bernstein introduced Lechner and Ray Allen to Howard M. Lawn ("Lawn"), a representative of the Most Reverend L. J. Reicher, Bishop of the Roman Catholic Diocese of Austin, Texas ("Bishop Reicher" or "Bishop"). Lawn stated that the Roman Catholic Church was interested in acquiring the corporations. Although at the outset Lechner desired merely to borrow additional capital, he concluded through negotiations with Bernstein that the most attractive deal would take the following form: The Allens would sell all or part of their interests in the Sportcraft corporations, the exact price to be determined by the future earnings of the Sportcraft corporations over a succeeding number of years. The buyer would liquidate the corporations, leasing their assets to a new operating corporation that would hire Ray Allen as manager. The buyer would provide the needed additional capital, and the Allens would still participate both financially and managerially in the future of the Sportcraft companies. The Allens engaged New York attorney Charles S. Lyon to represent them with respect to the sale of their stock in the *344 corporations. Considerable financial information was sent by Lechner to Equity and Capital Corporation, which did the investigative work for Lawn. After the financial data had been transmitted, and extensive negotiations completed, a contract dated March 13, 1964 ("Purchase Agreement"), was finally entered into wherein the Allens agreed to sell and the Bishop agreed to buy, 100 percent of the stock of Sportcraft Trailer and 70 percent of the stock of Shirl-Ray. The pertinent terms of the Purchase Agreement are as follows: (1) The purchase price shall be the greater of (a) $900,000.00 or (b) the contingent price determined in (2) below. (2) The contingent price shall be the sum of the following: (a) an amount equal to two-thirds of the annual "adjusted net profits" (as defined below) for a period of fifteen years from the date of the Lease referred to below, except for the period prior to September 30, 1965; and (b) an amount determined by reference to the "adjusted net profits" of the period prior to September 30, 1965, in the alternative as follows: (i) if such "adjusted net profits" for the period prior to September 30, 1965, do not exceed $900,000.00, an amount equal *345 to 29.67% thereof; or (ii) if such "adjusted net profits" for said period, shall exceed $900,000.00, the sum of $267,000.00, plus an amount equal to two-thirds of the amount by which the "adjusted net profits" exceed $900,000.00. (3) The term "adjusted net profits" as used herein means the "net profits", of the annual or other periods referred to above, as defined in the Lease, * * * adjusted as follows: (a) reduced by (i) the amount of any capital expenditures made by the Lessee [Sportcraft Homes] on behalf of, and chargeable to the account of, the Buyer [the Bishop]; and (ii) the amount of any expenditures directly by the Buyer to acquire property to be added to the Leased Property and (b) increased by (i) the excess of the proceeds of sale of any assets acquired by the Buyer hereunder and leased to the Lessee over their net book value as of the date of acquisition; and (ii) the proceeds of the sale of any assets subsequently acquired by the Buyer and added to the property leased to the Lessee, the acquisition of which assets resulted in a reduction of net profits when acquired. * * * (4) Within sixty (60) days of any receipt by the Buyer of rentals and royalties from the *346 Lessee in cash, the Buyer shall be required, to the extent of 74.074% of such cash receipt (reduced by any amount described in (a) (ii) of Paragraph (3) above), to make payment to the Sellers [the Allens] against any then unpaid amounts of purchase price determined under (1) or (2) above. Anything to the contrary contained in the Lease notwithstanding, the Buyer shall not be deemed to have received cash to the extent of (a) rental payments credited to the Lessee and charged to the Buyer, as a result of capital expenditures; or (b) any payments (either by the Lessor directly or by the Lessee on behalf of the Lessor) of principal and/or interest on any obligation (i) secured at the commencement of the Lease by any property leased or licensed by Lessor to Lessee or (ii) thereafter incurred to purchase any property leased or licensed by Lessor to Lessee. The entire purchase price not theretofore paid shall be unconditionally due and payable no later than April 1, 1980. (5) The payments of purchase price received by Sellers from the Buyer shall in no event total less than (a) $150,000.00 during the first sixty-three months from the closing hereunder; (b) an additional $150,000.00 during *347 the succeeding twenty-four months; and (c) an additional $225,000.00 during the next succeeding thirty-six months. On April 17, 1964, the transaction was closed, pursuant to the terms of the March 13, 1964 Purchase Agreement. Accordingly, the stock to be sold was transferred to the Bishop and 100% of the assets of Sportcraft Trailer and its subsidiaries, Sportcraft Arizona and Sportcraft California, were distributed in liquidation to the Bishop. In addition, 70% of the assets of Shirl-Ray were distributed to the Bishop. The assets distributed from Shirl-Ray to the Bishop constituted the operating assets of the Parkwood Home Division of Shirl-Ray. Shirl-Ray's remaining assets were distributed to the Allens in exchange for stock representing their remaining 30% ownership in the corporation. The assets distributed in exchange for this 30% interest were cash, an employee receivable and certain real estate not used by the corporation in its mobile home manufacturing business. Simultaneously with the liquidation distribution of the assets of the various corporations, the Bishop secured his purchase obligation to the Allens under the Purchase Agreement by granting them mortgages and chattel *348 mortgages on the properties received in the liquidations. The mortgages were subordinate (i) to all existing liabilities of Sportcraft Trailer and its subsidiaries and Shirl-Ray, and (ii) to the claims of all creditors arising out of the operation of the business of Sportcraft Homes (the operating company), and its successors or assigns. After April 17, 1964, the only interest which the Allens had in the assets of Sportcraft Trailer and its subsidiaries and those assets of Shirl-Ray which were distributed to the Bishop, was a security interest. Ray Allen believed that the value of his corporations was substantially in excess of $900,000 at the time he sold them to Bishop Reicher. He had great faith in the future of the Sportcraft corporations and the mobile home industry. Moreover, he knew that Bishop Reicher was obligated to pay a minimum of $900,000 for the business, regardless of what profits were generated in the future. By March 1965, the earnings of Sportcraft Homes alone were sufficient to assure him that the $900,000 minimum payment would be made. The partially contingent price agreed upon between the Allens and Bishop Reicher was well within a reasonable range of value *349 for the stock of the corporations being sold, and may have been less than what the Allens could have obtained from a nonexempt purchaser. Sportcraft Homes was formed on March 30, 1964 by Lawn, who originally owned 100% of the corporation's outstanding stock. Messrs. Harold W. Wolfram, Alexander R. Hamilton, and Neil S. Wolfram were the first directors of the corporation and they continued to serve in that capacity until their resignation on October 27, 1964. Ray Allen assumed the presidency of Sportcraft Homes on April 17, 1964, and in his capacity as such was responsible for its management. Ray Allen did not own stock in Sportcraft Homes nor did he have an employment agreement with the corporation; he was subject to discharge at any time. After selling their stock to the Bishop, the Allens discontinued their prior practice of personally endorsing the obligations of the mobile home operations. On April 17, 1964, Sportcraft Homes bought the current assets, which were received by the Bishop in the liquidation of Sportcraft Trailer, its subsidiaries and Shirl-Ray. The original price for these assets was $293,580.07, which was represented by a note from Sportcraft Homes to the Bishop *350 in that amount, plus the assumption by Sportcraft Homes of all current liabilities of the same corporation. Subsequently, due to an accounting adjustment, a new note was substituted in place of the old note, showing the purchase price for these current assets to be $302,070.07. At a meeting on April 17, 1964, the directors of Sportcraft Homes authorized the execution of a Lease and License Agreement ("Lease"), leasing from the Bishop the assets received by him in the liquidations, other than the current assets Sportcraft Homes had purchased. Pursuant to the terms of the Lease, Sportcraft Homes leased from the "Most Reverend L. J. Reicher, in his capacity as Bishop of the Roman Catholic Diocese of Austin, Texas" the following property, all of which had formerly been owned by Sportcraft Trailer, its subsidiaries, and Shirl-Ray: (a) the names, trade-names, good-will, books, records and customer's lists; (b) the chattels, machinery and fixtures; (c) the real property; and (d) the lessor's interest, as tenant, in leases of premises. In consideration for the use of the Bishop's property, the Lease required Sportcraft Homes to pay rent "equal to 90% of the net profits * * * resulting *351 from the use of the Leased Property." "Net profits" were defined by the lease as follows: The phrase "net profits" shall be construed to mean taxable income as reported on the Lessee's federal income tax return (excluding the rent * * * but after allowance of the net operating loss deduction, if any, and before allowance of the special deductions, if any, as enumerated in Schedule 1 of the 1963 U.S. Corporation Income Tax Return, Form 1120) as initially filed, computed in accordance with generally accepted accounting principles and practices by public accountants mutually acceptable to the parties hereto * * *. Without limiting the generality of the foregoing, in computing net profits, Lessee may deduct from gross income, all expenses incident to the operation of said business, including reasonable compensation of officers, employees and others engaged in the operation, supervision or conduct of the business. Another provision in the Lease permitted Sportcraft Homes to apply a portion of the rental payments, referred to above, to the improvement of the leased property and the acquisition of additional property as follows: Lessee hereby acknowledges that the Leased Property now *352 is in good repair. Lessee shall maintain the Leased Property in a good state of repair, ordinary wear and tear, fire and other unavoidable casualty alone being excepted. Lessee may alter, replace, substitute, add to or improve the Leased Property, and the costs and expenses thereof, if subject to capitalization as required by the Federal Internal Revenue Code and Regulations, shall be so capitalized, provided, however, that Lessee shall not expend, or incur expenses, for any such capital improvements or additions, during any twelve month fiscal period * * * in excess of the sum of $25,000.00, without the written consent of Lessor and of the Sellers * * *. Such expenditures, if deductible, shall be deducted from gross income in computing net profits hereunder; if capitalized, such expenditures shall be treated as a payment for the account of the Lessor and shall be considered as a payment on account of the rent due the Lessor hereunder. Any and all such alterations, replacements, substitutions, additions, improvements or repairs made in, and to, the Leased Property whether capitalized or not, shall be, and remain, or become, the property of Lessor, and Lessee shall execute and deliver *353 to Lessor all such documents as may be necessary to convey title to the same to Lessor. Lessor shall permit Lessee to use any such alterations, replacements, substitutions, additions, improvements or repairs under the terms of this Lease. Failure to pay any installment of rent when due would result in a default under the Lease, whereupon the Lease provided that: Lessor may notify Lessee of such default or violation and upon the failure of Lessee to cure such default within a period of sixty (60) days after the mailing of such notice, this Lease and the term hereunder, shall terminate and expire as fully and completely as if the date of expiration of such sixty (60) day period were the day fixed herein for the end and expiration of this Lease and Lessee shall then surrender the Leased Property to Lessor; and Lessor shall have the right to enter any premises or any part thereof in which the Leased Property may be located, and to take possession of all or any part thereof, either with or without process of law; and Lessee shall execute any and all instruments or documents necessary to reconvey to Lessor any and all property or rights acquired by Lessee hereunder. Under the Lease, *354 Sportcraft Homes incurred obligations to pay the Bishop the following rent: Fiscal Year Ended
Amount
6/30/64 *
$ 106,514.22
6/30/65 *
133,276.64
6/30/66 *
174,306.09
6/30/67
432,909.27
6/30/68
1,149,280.38
8/27/68
202,395.96
Total
$2,198,682.56
During its taxable years listed below, Sportcraft Homes made net payments to acquire capital assets, payments on the Bishop's obligations, payments to acquire another trailer manufacturing business, and cash payments to the Bishop as follows: Taxable
Cash Pay- Year
Capital Ex-
Bishop's
Purchase
ments to Ended
penditures
Obligations
of Business
Bishop***
Total
6/30/64 **
$ 22,223.73
$ 20,342.93
$ 0
$ 0
$ 42,566.66
6/30/65 **
30,371.72
119,293.17
0
0
149,664.89
6/30/66 **
42,143.21
91,069.25
22,187.50
0
155,399.96
6/30/67
9,415.24
119,487.55
20,881.00
140,000.00
289,783.79
6/30/68
56,740.94
51,391.52
0
765,000.00
873,132.46
Total
$160,894.84
$401,584.42
$43,068.50
$905,000.00
$1,510,547.76
*355 The total cumulative rent accrued and remaining unpaid at the end of each year was the following: Fiscal Year Ended
Accrued Rent
6/30/64 *
$ 63,947.56
6/30/65 *
47,579.31
6/30/66 *
66,485.44
6/30/67
209,610.92
6/30/68
485,758.84
8/27/68
720,560.41
During the years 1967 through 1969, amounts were transferred from Bishop Reicher or the Bishop Reicher Trust to the Allens as follows: Date
Payor
Amount
3-16-67
Bishop
$ 74,074.00
6-19-67
Bishop
29,629.60
Total for 1967
$103,703.60
2-9-68
Bishop
$196,296.10
3-4-68
Trust
222,222.00
6-10-68
Trust
148,148.00
9-6-68
Trust
56,352.65
9-30-68
Trust
53,043.94
11-4-68
Trust
53,043.94
12-4-68
Trust
53,043.94
Total for 1968
$782,150.57
1-4-69
Trust
$ 53,043.94
2-3-69
Trust
53,043.94
3-6-69
Trust
53,043.94
4-3-69
Trust
53,043.94
5-5-69
Trust
53,043.94
6-4-69
Trust
53,043.94
Total for 1969
$318,263.64
It had been Ray Allen's understanding throughout the negotiations for the purchase of his stock in Sportcraft Trailer and Shirl-Ray that either Lawn personally or Lawn's corporation, Equity and Capital *356 Corporation, would arrange for at least $300,000 in additional financing for the mobile home manufacturing operation. When the financing was not forthcoming, friction developed between Allen and Lawn. Prior to April 17, 1964, the business had been in need of working capital; indeed that was a motivating factor for the transaction. However, after April 17, 1964 the situation rather than being alleviated was exacerbated: Ray Allen and Lechner were unable satisfactorily to explain the transaction to suppliers for the new lessee corporation, which needed extensive credit. Additionally, the fact that the Allens were no longer personally guaranteeing the credit of the operation further hampered Sportcraft Homes' ability to secure credit. Moreover, Lechner became disenchanted with Herbert Winick ("Winick"), the accountant that Lawn had chosen for Sportcraft Homes. This was caused in part due to a personality conflict between the two men, and in part due to a difference of opinion over accounting methods. When Lechner discussed the problem with Lawn, he was informed that Winick's judgment would prevail. About the same time that Ray Allen and Lechner were turning against Lawn, Ruben H. *357 Johnson ("Johnson"), a long-time close friend and business advisor of Bishop Reicher, learned of Lawn's involvement with the Bishop. Johnson is a devout Roman Catholic and has received many religious honors. In 1965 he was knighted by Pope Paul VI. Partially because Lawn had been convicted of a felony and had spent time in jail, Johnson felt that the Bishop should disassociate himself from Lawn. Johnson and Father Maurice C. Deason, an aide to the Bishop, came to Clearwater to meet with Ray Allen and Lechner, who expressed their desire that the Bishop disassociate himself from Lawn. On September 17, 1964, Ray Allen and Lechner met in Austin with Johnson, Bishop Reicher and the Bishop's lawyer, Leonard Franklin ("Franklin"). Ray Allen and Lechner reiterated their dissatisfaction with Lawn and his failure to produce additional financing. Lechner suggested that Lawn's Sportcraft Homes' stock be purchased. On September 21, 1964, Ray Allen wrote Bishop Reicher that a source of capital in the amount of $300,000 assured him nine months ago had not been forthcoming. The promise of this capital Ray Allen considered to be a condition to the entire transaction. Furthermore, he felt that *358 Lawn had violated his position of trust. After discussing the foregoing with the Bishop, Johnson was asked by the Bishop to go to New York City to meet with the interested parties and acquire all of Lawn's interest in Sportcraft Homes. From October 26 through October 28, 1964, Johnson met with Ray Allen, Lechner, Charles S. Lyon, Franklin, Father Deason, Lawn, and Harold Wolfram. At these meetings, Johnson purchased Lawn's 50 shares of Sportcraft Homes, representing 100 percent interest in the company, for $12,300, a figure calculated by Lechner as the approximate book value of Sportcraft Homes at the time. Johnson paid for the stock with a $3,000 check and a $9,300 promissory note. On October 27, 1964 Bishop Reicher deposited $3,000 into the bank account of Johnson's company, R. H. Johnson Enterprises. Subsequently, Johnson executed a $3,000 demand note payable to the Bishop. After Johnson purchased the stock from Lawn, the Bishop called a meeting of advisors. The group consisted of Johnson, A. J. Maloney, James Nash ("Nash"), Father Deason, John W. Bode ("Bode"), and a Mr. Butler. Nash is from Austin, Texas, and at the time of trial was semi-retired. He was one of the organizers *359 of the Capital National Bank in Austin, Texas, and is currently Chairman of the Board. He is a Roman Catholic and has received various religious honors, such as membership in the Knights of Malta. He has been a good friend of Bishop Reicher for many years, and, on occasion, the Bishop has called upon him for business and other types of advice. He has extensive experience in a variety of businesses. Bode is a banker with the Capital National Bank in Austin, Texas. He has been acquainted with Bishop Reicher, Johnson, and Nash for about 25 years and has often rendered financial advice to the Bishop. The major items discussed at the gathering were the involvement of the Bishop with Lawn and the future of the recently acquired Sportcraft Homes stock. In accordance with a discussion that the Bishop and Johnson had previously had, Johnson offered to sell approximately one-third of the stock of Sportcraft Homes to Nash and a like amount to Bode, retaining approximately one-third himself. Both accepted. On November 2, 1964, Nash gave his $4,182 note to Johnson in payment for 17 shares, and Bode gave his $3,936 note to Johnson in payment for 16 shares. Both notes were payable only out of *360 dividends, distributions and other proceeds arising out of their ownership of the Sportcraft Homes shares. At approximately this time, Franklin became General Counsel and Assistant Secretary of Sportcraft Homes, positions which he continued to hold, except for a six or eight week hiatus in 1965, until August of 1968. On November 2, 1964, the new stockholders of Sportcraft Homes held a meeting in Austin, Texas. At this meeting the resignations of directors Harold W. Wolfram, Alexander R. Hamilton and Neil S. Wolfram were accepted by the stockholders, who then elected Johnson, Nash and Bode as directors. Messrs. Johnson, Nash and Bode continued to serve as directors of Sportcraft Homes until it was sold to National Homes in August 1968. In their capacity as directors, Messrs. Johnson, Nash and Bode were active in the management of the corporation. The Board of Directors held several meetings each year and made visits to the corporation's plants in Florida, California, Washington, and Texas. The directors conferred frequently with Ray Allen and Lechner, the corporation's principal officers, in an effort to steer the corporation in the right direction. Bishop Reicher never took part *361 in the management of Sportcraft Homes. His sole interest in the corporation was as lessor of the corporation's operating assets. He exercised no control of any kind over the officers or directors. On June 13, 1964, apparently motivated by reasons separate from his business dealings with the Allens, Bishop Reicher executed a trust agreement entitled "Trust Agreement of The Louis J. Reicher, First Bishop of Austin, Trust." On that same day the first meeting of trustees occurred. The trustees were Johnson, Maloney, Nash, and Father Deason. Bishop Reicher was appointed manager of the Trust, authorized to sign all checks in the Trust's name, and empowered to purchase and sell securities in his discretion. Subsequent to the creation of the Trust, various assets were transferred by the Bishop to the Trust. The record fails to indicate the method of accounting either the Bishop or the Trust employed in keeping books and records or in filing Federal income tax returns. Paragraph V-1 of the Trust Agreement reads as follows: It is the Grantor's desire that the income from the trust be used for gifts, grants, endowments or loans to agencies and instrumentalities of the Roman Catholic Church *362 in the State of Texas and, in particular, in the Diocese of Austin, including by way of illustration and not by way of limitation, parishes, schools, hospitals, convents and other Dioceses. The Trustees shall, in their sole discretion, use all of the income of the trust or such portion thereof as they shall determine for such purposes. Such portion of the income of the trust as is not so used may, from time to time, be invested and reinvested in the same manner as other properties of the trust, but it shall not thereby lose its status as trust income and it, together with the income therefrom, shall continue to be available for gifts, grants, endowments or loans in the manner aforesaid whenever the Trustees determine that it should be so used. When the Trustees make loans to agencies and instrumentalities of the Roman Catholic Church in the State of Texas, they shall charge interest thereon at the rate no higher (and which may be lower) than the then prime interest rate of the Federal Reserve Bank in Dallas, Texas. The word "income" as used herein means net income. Johnson believed this section to be an absolute prohibition against loans to the Church, its agencies, or instrumentalities *363 at interest rates above that of the prime rate at the Federal Reserve Bank in Dallas. On January 6, 1965, the Sportcraft Homes' Board of Directors held a meeting in Austin, Texas, at which Ray Allen continued to assert the business' need for additional financing. On February 17, 1965, Bishop Reicher wrote a letter to the Trust requesting that a loan in the amount of $600,000 be made to Sportcraft Homes. The Bishop was aware that the Trust lacked the necessary liquid funds to make such a loan, and suggested that the Trust borrow the money, using the assets of the Trust as collateral. The Bishop was also aware that two of the trustees of the Trust owned stock in Sportcraft Homes but concluded that this fact should not hinder the Trust from making the loan. The Bishop agreed to subordinate rent accruing to him under the Lease with Sportcraft Homes dated April 17, 1964 to the repayment of the loan and any interest thereon. On February 17, 1965, the Trust borrowed $600,000 from City National Bank of Austin, Texas, at 5-3/4 percent interest per annum, secured by corporate stock and repayable within three years. On March 4, 1965 the Trust loaned $600,000 to Sportcraft Homes at 7-1/2 percent *364 interest, repayable at the rate of $20,000 per month and secured by an assignment of Sportcraft Homes' accounts receivable and unsold mobile homes. The collateral was at all times to be no less than 125 percent of the remaining balance of the note. The Dallas Federal Reserve prime rate was approximately 5 percent at the time. In consideration for the Bishop arranging for the Trust to loan the $600,000 to Sportcraft Homes, Ray Allen, in his personal capacity, agreed to release the Bishop from the guaranteed minimum purchase price of $900,000. The Bishop agreed to amend Paragraph 2 of Schedule 1 of the March 13, 1964 Purchase Agreement to read as follows: (2) The contingent price shall be an amount equal to two-thirds of the annual "adjusted net profits" (as defined below) for a period of fifteen years from the date of the Lease referred to below. Since another source of financing was located a few months later, the loan was repaid in full by August 19, 1965. While both the market conditions and outlook in the mobile home industry were excellent, Sportcraft Homes continued to have certain problems concerning accounts receivable and inventories. As a consequence, the Board of *365 Directors, at a meeting on July 1, 1965 ordered Ray Allen as president both to reduce inventory and collect accounts receivable within three to four months. The possibility of discharging Ray Allen as president of the corporation was discussed and this fact was unequivocally communicated to him. No one involved had any doubts concerning the Board's authority to do so. Ray Allen satisfactorily consolidated Sportcraft Homes' financial position, as directed by the Board, within a shorter period of time than was specified, and no further problems were encountered. At the Sportcraft Homes Board of Directors meeting on November 8, 1965, it was unanimously resolved that the officers of the corporation should dispose of their interests in retail sales lots as soon as practical and that any employee of the company affiliated with any supplier or dealer should be subject to dismissal. This proposal was aimed specifically at Ray Allen who held such interests. He complied with this directive. After the infusion of the new working capital on March 4, 1965, Sportcraft Homes became increasingly profitable. It reported taxable income as follows: Taxable Year Ended
Taxable Income
June 30, 1964
$ 11,834.91
June 30, 1965
14,808.52
June 30, 1966
19,367.34
June 30, 1967
48,101.03
June 30, 1968
127,697.82
August 27, 1968
22,488.44 [4]/
*366 A chance meeting occurred during the early part of 1968 between Lechner and George Parry, a broker, at which the sale of the various Sportcraft Homes' interests and operating assets was briefly mentioned. This contact eventually led to the sale of all these various interests to National Homes Corporation ("National Homes") in August 1968. Once again, attorney Charles S. Lyon was retained by the Allens. Bishop Reicher, the Allens and National Homes ultimately entered into an Agreement dated August 12, 1968, the pertinent terms of which are as follows: 1. The Bishop agreed to cause the exchange of all 50 shares of the stock of Sportcraft Homes for 5,550 shares of the common stock of National Homes. 2. The Bishop agreed to sell and convey to National Homes all of the real and personal property and all his interest in the lease of said real and personal property to Sportcraft Homes for $1,000,000 and 10,760 shares of the common stock of National Homes. Of such shares, 6,944 were to be placed in escrow. 3. The Allens were to transfer all right, title, *367 and interest in their contract with the Bishop for (a) $2,475,000 cash, (b) National Homes' demand note for $525,000 bearing interest of 7% per annum, and (c) 32,300 shares of the common stock of National Homes, 20,830 of which were to be placed in escrow. 4. It was understood by the parties that the number of shares of National Homes' common stock to be delivered to the Bishop and the Allens was calculated on the basis of $18 per share of said stock. It was agreed that the number of said shares deliverable and the number thereof placed in escrow as to be adjusted upward or downward depending on the average of the closing daily prices of the stock on the Midwest Stock Exchange for the last ten trading days prior to the day of closing. The August 12, 1968 Agreement provided, among other things, that part of the stock to be received by the Bishop and the Allens was to be placed in escrow to secure National Homes against any claims made against National Homes or Sportcraft Homes arising out of events which occurred before the sale. As required by the August 12th Agreement, a depositary agreement was entered into whereby the Allens deposited 18,747 [5] shares and the Bishop deposited *368 6,249 shares with Capital National Bank of Austin. The representatives of National Homes were aware that the Federal corporate income tax returns for the fiscal years ended 1964, 1965 and 1966 of Sportcraft Homes had been previously audited by respondent and that a question about deductibility of the rental payments had been raised. The rental deductions were eventually conceded by respondent; however, National Homes required that a substantial amount of its stock be placed in escrow to cover any contingencies. Prior to the sale to National Homes, Lechner and Franklin extensively negotiated the allocation of the price to be received from National Homes. Lechner represented the Allens and Franklin represented the Bishop and the stockholders of Sportcraft Homes during these negotiations. As a result of the negotiations among Lechner, Franklin, and National Homes, the stockholders of Sportcraft Homes were not required to sign the August 12, 1968 Agreement, although they did transfer *369 to National Homes, and receive consideration for, their Sportcraft Homes stock. The negotiators agreed that the easiest way to isolate the Sportcraft Homes stock-holders from any potential liabilities was for the stock-holders not to be direct parties to the contract and to authorize assignments of the sale proceeds to them. When the Bishop agreed to cause delivery of the Sportcraft Homes stock to National Homes he was acting under authority from the Sportcraft Homes stockholders to make such a commitment. The transactions agreed to in the August 12, 1968 Agreement were closed on August 28, 1968. As agreed, the Allens received $2,475,000 cash, a note for $525,000 and 29,070 shares of National Homes stock. The Allens transferred 9,500 shares of the National Homes stock to Bernstein as part of his brokerage commission. Of the remaining 19,570 shares, 18,747 shares were placed in escrow pursuant to the depositary agreement and the remaining 823 shares were received by the Allens individually. The Sportcraft Homes shareholders each received approximately $38,000 worth of National Homes stock for their stock. This figure was calculated as being roughly equal to the then book value of *370 the stock of Sportcraft Homes. The value of a share of National Homes stock at the closing of August 28, 1968 was $20 per share. At the time of the sale to National Homes, Ray Allen owed Sportcraft Homes between $530,000 and $535,000. This loan was secured by real estate which the Allens owned personally. At the closing of the National Homes transaction, Ray Allen paid off his debt to Sportcraft Homes by giving it the note for $525,000 which he had received from National Homes and his personal check for the difference, which was something less than $10,000. The record does not disclose the precise amount. In his statutory notice of deficiency respondent disallowed Sportcraft Homes' claimed rent expense as follows: Disallowed Rent Taxable Year Ended
Expense
June 30, 1967
$ 337,920.32
June 30, 1968
1,053,817.19
August 27, 1968
186,485.43
Total
$1,578,222.94
In addition, respondent determined, in the alternative, under section 267, that Sportcraft Homes had entered into a lease agreement with a related party, and that since Sportcraft Homes was on the accrual method of accounting and the lessor was on the cash basis, accrued rent not paid within two *371 and one-half months after the close of the taxable year is not deductible, as follows: Disallowed Rent Taxable Year Ended
Expense
June 30, 1967
$209,610.92
June 30, 1968
409,682.96
August 27, 1968
202,395.96
Total
$821,689.84
On their 1964 Federal income tax return the Allens did not report any gain or income from the sale of their stock in Sportcraft Trailer and Shirl-Ray. They stated, in part, as follows: During the taxable year, the taxpayers sold, in a single sale and for a single price, 2000 shares of stock of Sportcraft Trailer Manufacturing, Inc. and 350 shares of Shirl-Ray Corporation, both incorporated under the laws of Florida. The amount of the sales price is not yet determinable. A copy of the provisions for its ultimate determination, as set out in the contract of sale, is attached hereto, marked Schedule 1. No payments of the sale price were received by the taxpayers in 1964. Taxpayers are advised that the contingent obligation to make payment of the purchase price is not susceptible of valuation. In the event, however, that the contrary should be determined, taxpayers elect the use of the installment method of reporting gain under *372 section 453 of the Internal Revenue Code. On their joint Federal income tax returns for the years 1964 through 1969 the Allens reported the following amounts received from Sportcraft Homes as long term capital gain, and interest pursuant to section 483: Long Term
Section 483 Year
Capital Gain
Interest
1964
$ 0
$ 0
1965
0
0
1966
0
0
1967
92,128.50
11,575.10
1968
671,120.33
111,030.24
1969
265,218.66
53,044.98
Total
$1,028,467.49
$175,650.32
On their 1967 Federal income tax return, the Allens reported a cost basis in the stock of Sportcraft Trailer and Shirl-Ray, sold to Bishop Reicher in 1964, of $27,013.25. In addition, on their 1968 joint Federal income tax return, the Allens reported as long term capital gain the amount of $3,000,000 received on August 28, 1968, from National Homes. This amount was composed of $2,475,000 cash and the $525,000 note. The stock of National Homes received by the Allens was not reported as income. However, on the return was a statement informing the government that the reported $3,000,000 gain on the sale to National Homes "[excludes] common stock of purchaser subject to restrictions *373 on marketability, majority of which is held in escrow." The Treasure Isle Motel was purchased by Ray Allen in 1967. It was subsequently renovated, and opened as the Runaway Bay Club ("Club") in early 1968. The books and records of Runaway Bay Club were kept under Lechner's supervision and control. To assure that the accounting system for Runaway Bay Club was properly set up, Lechner retained the services of an accounting firm to set up a proper accounting system. In 1969 Wolf & Company, Certified Public Accountants, were retained to perform a review of the internal controls and procedures for the Runaway Bay Club. In addition, they prepared a revised Schedule C for the Allens' 1968 income tax return covering the Runaway Bay Club operations. The amended Schedule C showed a much larger loss than was claimed by the Allens on their 1968 income tax return. This amended Schedule C was not filed with the Internal Revenue Service because the additional loss would have been of no tax benefit to the Allens. Two representatives of Wolf & Company spent at least one month each doing their accounting work on the Runaway Bay Club. Numerous audit procedures were undertaken in an effort to *374 verify the accuracy of the accounting records. Daily motel reports were reviewed and the data from these reports were traced to the income as reflected in the Club's books for the particular day under review. In addition, either cash receipts were traced or receivables confirmed as further verification of the authenticity of the charge to a customer. Also, accounting papers that were created by various personnel in the club were reviewed in an attempt to verify the accuracy of the accounting records as to both income and expense. The procedures pertaining to the analysis of expenses were especially complete. The major accounts were analyzed and all liabilities and accruals were reviewed to determine that items were properly recorded and reflected in the financial records. In fact, each and every account payable was reviewed in one form or another. As a result of these procedures, numerous adjustments were made to the records for Runaway Bay Club for both 1968 and 1969. In preparing the amended Schedule C, James Ohlman of Wolf & Company started with the financial statement which had been prepared by the controller of Runaway Bay Club. James Ohlman had already established that this *375 statement had been prepared from the books of the Club and as a result had been prepared on the accrual basis. One of the first adjustments made in preparing the amended Schedule C was to convert the books of the Club from the accrual basis to the cash basis, which the Allens used for tax return purposes. Numerous entries were prepared in making this conversion and the net result was that the expenses of the Club were increased substantially. Another material adjustment resulted from the deduction of pre-opening expenses. Other adjustments leading to an increase in expenses arose as the result of the payment by Ray Allen of expenses of the Club out of checking accounts which were not in the Club's name and which, therefore, had not initially been accounted for in computing the Club's net operating loss. The statutory notice of deficiency contained numerous adjustments to various expense items, all of which resulted in a reduction of the claimed net operating loss. There is a striking similarity between the adjustments contained in the statutory notice of deficiency and those contained in James Ohlman's amended Schedule C. In almost every case where the statutory notice of deficiency *376 decreased the Club's expenses, the adjustment made was identical to the penny with the adjustment made by James Ohlman in his amended Schedule C. Furthermore, the statutory notice of deficiency contained no items which allowed the taxpayer an additional expense for club operations, although James Ohlman's amended Schedule C had many such adjustments. Expenses for interest, insurance and depreciation on certain boats owned by the Runaway Bay Club were disallowed in 1968 and 1969. The boats were purchased by the club for boat rental and skiing, and fees were charged. The Club's accounting records set up a separate item called boat revenue to account for the boating operations. These boats were not owned or operated for Ray Allen's personal use. OPINION 1. The 1964 Transaction.
The Allens owned Sportcraft Trailer and its subsidiaries, corporations operating mobile home manufacturing plants in Florida, California and Arizona. They also owned Shirl-Ray, a corporation operating another such plant in Florida. Although these corporations were quite profitable and possessed great potential for growth in a growth industry, they were experiencing financial difficulties because of *377 a shortage of working capital. When the corporations were unable to borrow sufficient additional money from various bankers, one of the bankers placed an advertisement in the Wall Street Journal seeking help for the companies. Bernstein, a business finder or broker, responded to the advertisement, representing that he had available to him interested purchasers, including a tax exempt organization. With Bernstein acting as broker, the Allens eventually disposed of the stock of their corporations to Bishop Reicher. Between Bernstein's first contact with the representatives of the Allens and the signing of an agreement for the sale of their stock in Sportcraft Trailer and Shirl-Ray to Bishop Reicher, there were extensive negotiations between the Allens' representatives (including Bernard Lechner and attorney Charles S. Lyon) and the Bishop's representatives (including Howard M. Lawn and attorney Harold Wolfram). The Purchase Agreement, dated March 13, 1964, was consummated at a closing on April 17, 1964. The Allens delivered to the Bishop ownership of 100 percent of the stock of Sportcraft Trailer and 70 percent of the stock of Shirl-Ray. Pursuant to plan, both corporations and *378 their subsidiaries were immediately liquidated and their assets distributed to the Bishop in exchange for his shares, except for certain non-operating assets of Shirl-Ray which were distributed to the Allens in exchange for their retained 30 percent stock interest. The Bishop then delivered to the Allens mortgages on the tangible property received by him in the liquidation. The mortgages secured payment of his purchase price obligations to the Allens. Further, pursuant to the Purchase Agreement, the Bishop leased all the operating assets he had acquired, including real property, plants, equipment, trade names, customer lists and goodwill, to a newly organized corporation under terms set forth in a Lease annexed to the Purchase Agreement. This Lease called for rental payments equal to 90 percent of "net profits", as defined, against which could be credited amounts spent by the lessee for capital expenditures for the account of the lessor. The lessee corporation, Sportcraft Homes, had been formed by Lawn, who originally owned 100 percent of its stock. It gave a note to the Bishop for $293,580.07 in exchange for the net current assets of the business. The purchase price for the stock *379 as set out in Schedule 1 to the Purchase Agreement was to be the greater of $900,000, payable not later than April 1, 1980, or a contingent price based on the earnings of the business operated by Sportcraft Homes over a period of 15 years from the date of the closing. More specifically the contingent price was two-thirds of "adjusted net profits" as defined (essentially net profits per the Lease definition less capital expenditures), except that the percentage paid was 29.67 percent with respect to aggregate adjusted net profits up to $900,000 for the period from closing to September 30, 1965. The timing of payments of the purchase price was partially geared to the Bishop's receipt of rents and royalties "in cash" (as defined in the Purchase Agreement) from Sportcraft Homes. A minimum of $150,000 was payable during the first 63 months after closing; an additional $150,000 in the succeeding 2 years; and an additional $225,000 during the succeeding 3 years. The entire purchase price not previously paid was ultimately payable on April 1, 1980. In March, 1965, in consideration for the loan of $600,000 from the Bishop's Trust to Sportcraft, the Allens released the Bishop from his unconditional *380 liability to pay the $900,000. At that time the Allens were convinced the assets and earnings of the business would be sufficient to meet at least that minimum purchase price. The contingent price at the same time was revised to a straight two-thirds of net profits, as defined, for the same 15-year period. Respondent, challenging the Allens' treatment of their gain on the sales as long-term capital gain, argues that the 1964 transaction did not constitute the sale or exchange of capital assets because it was a "sham," "lacking in substance," and lacking "substantial economic reality" and because the purchase price was "unrealistic, not fixed, specifically tied to the earnings and profits of the business, and unreasonably excessive." Respondent relies on Commissioner v. Brown,380 U.S. 563 (1965) (hereinafter referred to as the Clay Brown case); Louis Berenson,59 T.C. 412 (1972), affirmed in part and reversed in part, F. 2d (C.A. 2, 1974) [34 A.F.T.R. 2d 74-6181]; Emanuel N. (Manny) Kolkey,27 T.C. 37 (1956), affirmed 254 F. 2d 51 (C.A. 7, 1958) and Rev. Rul. 66-153, 1966-1 C.B. 187. *381 Respondent does not, however, raise any issue regarding the taxable year within which such gain is to be reported. Respondent's contention that the sale was a "sham" or lacks "substantial economic reality" is not persuasive. Whatever may be the appropriate characterization of the 1964 transaction for tax purposes, it is at least entirely clear that the transaction effected a significant and premanent transmutation of the sellers' legal relationship to the business they disposed of. The leading case in which we found a "sham" to exist in a "bootstrap" purchase such as this was Kolkey,supra. In Kolkey the facts disclosed an economically less-than-viable transaction, marked by a purchase price some four times the fair value, and by the seller's early reacquisition of the transferred assets. The charitable purchaser there ended up with no substantial economic advantage by virtue of the arrangement, and the facts were such that even viewed as of the inception of the purported sale there was no reasonable probability the purchaser would ever end up with assets of value. In the present case the sellers never reacquired the assets nor at the time of the sale was *382 there any reason to believe reacquisition was likely. The purchase price, as we have found, was within a reasonable range, and the substantial reality of the transaction from the purchaser's viewpoint was adequately evidenced by the $1,193,660 the Bishop ultimately was able to obtain from sale of his economic position. There was no reason to believe that the transaction was less than economically viable or that the purchasers would be unable to meet the agreed terms. There is no merit in the respondent's contention that the case is governed by Kolkey. See Clay B. Brown,37 T.C. 461 (1961), affirmed 325 F. 2d 313 (C.A. 9, 1963), affirmed 380 U.S. 563 (1965). Respondent also contends that the price was "unrealistic" and "unreasonably excessive." It is his position that Clay Brown does not apply to a sale if the sales price exceeds the fair market value of the transferred assets. He relies on Rev. Rul. 66-153, 1966-1 C.B. 187, which states that Clay Brown applies only if the purchase price does not exceed the value of the assets sold. Read literally, this Ruling would purport to repudiate the Supreme Court opinion in the *383 Clay Brown case itself, since in that case the purchase price of $1,300,000 somewhat exceeded the fair market value of the transferred stock and notes. (The petitioner in Clay Brown adduced no testimony placing the net asset value above $1,064,877 and the notes were for $125,000. 37 T.C. at 469.) While we stated in our opinion in Clay Brown that the price was "within a reasonable range", there was no finding therein of one-to-one equivalence of price and fair market value. Valuation being an imprecise matter at best, no rule of law invalidates an otherwise bona fide transaction merely because a trier of fact might find a value somewhat less than the sales price. However, where the sales price becomes in fact "unreasonably excessive", doubt may be shed on the propriety of characterizing the transaction as a sale, because such a "sale" may often be a sham. Louis Berenson,supra;Aaron Kraut,62 T.C. 420 (1974). But see Union Bank v. United States,285 F. 2d 126 (Ct. Cl., 1961). Where, as here, a purchase price varies with the subsequent productivity of the assets transferred, there are some practical *384 problems in applying the above principles. The value of the transferred assets must be compared not with a settled cash sum, but with a set of contract rights which itself has no readily ascertainable market value. However, we see no reason to approach the valuation of these rights on any basis other than that which we would apply to the evaluation of any other income-producing asset for which no readily ascertainable market value exists, i.e., by making our best estimate of the present commuted value, on the date of sale, of the total projected future stream of payments under the contract. There is seemingly no dispute over this approach, for both parties have here applied it, petitioner seeking to demonstrate thereby that the Bishop's obligations to the Allens under the 1964 contract had a value to the Allens not in excess of the value of the stocks they sold, and respondent using the same technique to show that the contract rights had a value in excess of that of the stock disposed of, so that an "unreasonably excessive" price was being paid. Viewing the matter of valuation in this light, we were more persuaded by petitioners' expert than respondent's and conclude that the *385 price was not "unreasonably excessive." In fact, we are of the view that the contract rights had a value not greater than that of the stock being sold. Respondent's expert, Dr. Dietz, valued the stock sold at $1,158,124 or four times pretax earnings (an assumed 25 percent pre-tax rate of return to the purchaser). In valuing the contract rights received by the Allens at $2,200,000, however, he assumed the market would demand only a 10 percent pre-tax return on the delayed payments. Accordingly he used a 10 percent discount factor in computing the present value of the contract rights. Yet, because of the terms of the Purchase Agreement, the risk factors and other income stream characteristics for both the sellers and the buyer were quite similar, and, presumably, each of them would demand about the same return on his or their investment. Since the significantly different rates of return assumed by Dr. Dietz were applied to the same projected earnings in arriving at the value of the stock sold and the contract rights received, it is inevitable that Dr. Dietz arrived at a higher value for the contract rights than for the stock. In short, the effect of his assumptions was to create a built-in *386 bias, necessarily giving a higher value to the contract rights. Dr. Dietz thus found that a contract right to less than 2/3rds of a business' net profits for 15 years was worth more than the stock which carried the right to 100 percent of such profits in perpetuity. We reject Dr. Dietz's assumption, for the contract rights on the terms here could have no higher value than that of the income-producing assets out of which they would have to be satisfied, unless such excess be found by virtue of the $900,000 guarantee. Dr. Dietz did not rely on the latter for his conclusion, finding the value of the contract right to be more than double the guarantee. Moreover, we conclude that the four times pre-tax price-earnings multiple Dr. Dietz applied to Sportcraft Trailer and Shirl-Ray was inadequate. Dr. Dietz used as comparative companies established, larger companies primarily located in the Northeast. They were in a less rapid growth phase than Sportcraft Trailer and Shirl-Ray. They also lacked strategically located plants in the rapid growth areas of California, Arizona and Florida. Also, more weight should have been given to Sportcraft Trailer's and Shirl-Ray's very strong management team *387 and established sales organizations. Dr. Dietz applied a 20 percent discount because the Allens' stock sold to the Bishop was unregistered and without a public market. However, where an entire enterprise is being purchased, rather than a small stock interest being purchased by a passive investor, a premium is often paid for such controlling interest rather than the discount which is applied to a minority interest which has no public market. Dr. Dietz understated the earning power of Sportcraft Trailer and Shirl-Ray in making his computations. And in valuing the Allens' contract rights, Dr. Dietz failed to take into account the fact that Sportcraft Homes, the lessee, was entitled to make capital expenditures which in turn reduced the amount of the payment to which the Allens would be entitled under the Purchase Agreement. On the other hand, petitioner's expert, Mr. Burch, relied on his substantial experience in the acquisitions field to determine whether the sale was at a reasonable price and terms. He concluded that the sale could have been arranged with a taxpaying entity, rather than a tax-exempt organization, on the same price and terms. It is well known that the valuation *388 of assets based on earning power is a very difficult problem. The principal difficulty is estimating future earnings. Here the Purchase Agreement itself made that unnecessary, because the price was tied to future earnings over a 15 year period. Mr. Burch had negotiated other contingent deals at about the same time and believed he could have negotiated the sale of the Allens' stock to a taxable purchaser on terms even more advantageous to the Allens than those contained in the Purchase Agreement. As we stated above, contrary to respondent's contention, we do not find the purchase price "unrealistic" or "unreasonably excessive." Rather we find the purchase price and terms to be within a reasonable range. Therefore cases involving payment of an unreasonably high price are distinguishable. In Kolkey,supra, this Court and the Seventh Circuit denied capital gain treatment to a "bootstrap sale" to a charity, in the face of a purchase price so high (four times fair value) that it was clearly unreasonable, and in view of the sellers' prompt reacquisition of the assets. In Louis Berenson,supra, this Court at 59 T.C. 421 found the *389 price paid "grossly excessive" (more than double value) and the majority refused to recognize the transaction as a bona fide sale. [6] In Aaron Kraut,supra, this Court held that the "bootstrap sale" involved was a sham which falls within the rule of Kolkey.
The instant case, however, falls within the Clay Brown holding that where the price is within a reasonable range and a true final disposition is intended, a "bootstrap sale" will be recognized for tax purposes. Boone v. United States,470 F. 2d 235 (C.A. 10, 1972). The facts in Clay Brown and in this case are very similar. Here, as in Clay Brown, ownership of corporate stock was transferred in exchange for deferred payment obligations. In each case the corporations were promptly liquidated, and the business assets were leased to a newly organized corporation with rental payments determined by reference to the profits of the lessee corporation. In Clay Brown, the purchaser *390 undertook no general liability to pay the stated purchase price. The sellers could look only to the assets of the business that was sold. Here the purchaser gave an unconditional promise to pay a minimum purchase price, although about a year after the closing the parties agreed to eliminate this provision. In Clay Brown, the purchase price was demed "within reasonable limits" in relation to value, although possibly greater than a non-exempt purchaser would have paid. The price there was $1,300,000 for stock valued by the petitioner's appraiser at $1,064,877 and notes of $125,000. In the instant case we have found as a fact the price and terms were reasonable in relation to value. In Clay Brown, the requirements on timing of payments to avoid default were more stringent than in the Allens' sale to the Bishop. In fact, in Clay Brown, conditions of default did occur; in lieu of repossession the parties joined in a sale of the business, and the sellers ultimately received only about $936,000, approximately 72 percent of the $1,300,000 price. In this case default was never in prospect. After four years the parties joined in selling their respective interests for cash, a *391 note and stock equal to $4,886,060, of which the Allens received $3,581,400 and the Bishop received $1,193,660. The three shareholders of Sportcraft Homes received a total of approximately $114,000 in National Homes stock. The test of hindsight shows that far from being victimized by being sold dubious assets at an excessive price, the Bishop had his business judgment amply vindicated by the ultimate events. Here, as in Clay Brown, the sellers did not become shareholders of the lessee corporation. Here, as in Clay Brown, the managing head of the business that was sold assumed the same position with the lessee corporation. However, Mr. Clay Brown initially had a management contract and the right to name his successor if he himself resigned. Ray Allen did not have an employment contract, and, at one point, the directors of Sportcraft Homes seriously considered firing him. Respondent contended in his successful petition for a writ of certiorari that Clay Brown was a tax case "of rare importance" which would broadly illuminate the whole field of asset dispositions where the amount or timing of the purchase price depended on subsequent productivity of the assets transferred. *392 Government's Petition for a Writ of Certiorari (in Clay Brown), page 7. Respondent now contends that Clay Brown should be narrowly limited to its facts. We do not so view the Supreme Court's decision. A large part of respondent's brief is devoted to rearguing various points he argued in Clay Brown to this Court, the Ninth Circuit and the Supreme Court, all of which were rejected. Those arguments of law decided against respondent in Clay Brown are not subject to relitigation here. Respondent makes much of the fact that the purchase price payment to the Allens was reduced by permitted capital expenditures made by the lessee corporation, calling it a most unusual provision. However, corresponding provisions were common in many of the bootstrap sales cases. See University Hill Foundation,51 T.C. 548, 555 (1969), reversed and remanded 446 F. 2d 701 (C.A. 9, 1971), certiorari denied 405 U.S. 965 (1972); Royal Farms Dairy Co.,40 T.C. 172, 178 (1963), remanded pursuant to stipulation, 17 A.F.T.R. 2d 356, 66-1U.S.T.C. par. 9296 (C.A. 9, 1965); Warren Brekke,40 T.C. 789, 795 (1963), *393 vacated and remanded pursuant to stipulation, (C.A. 9, March 25, 1966), decision on remand being a Memorandum Opinion of this Court; Anderson Dairy, Inc.,39 T.C. 1027, 1035 (1963); Est. of Sol Goldenberg, a Memorandum Opinion of this Court, reversed and remanded pursuant to stipulation subnom.Golden West Rubber Products, Inc. v. Commissioner, 66-1 U.S.T.C. par. 9297 (C.A. 9, 1965); and Isis Windows, Inc., a Memorandum Opinion of this Court. In these cases since there was a fixed price, the timing, rather than the ultimate amount, was affected by the capital expenditures, which were credited to rentals owed by the lessee. We see no reason why such a contingency should be held inconsistent with sale treatment. Without some such provision the thinly-capitalized lessee corporation, which had no ready source of capital other than the profits it produced, might have had difficulty in continuing. It could not continue to operate if it could not at least generate the funds to replace worn out equipment. There is one significant factual difference between this case and Clay Brown:Clay Brown involved a fixed price payable *394 over an indefinite period [7] out of earnings, and without recourse against the buyer, whereas this case involves a minimum fixed price with such recourse, plus a material non-recourse contingent additional price, based, as in Clay Brown, on the post-transfer productivity of the transferred assets. The question is whether the fact that the purchase price provided by the Purchase Agreement in this case was to a large extent variable and contingent on the future earnings of the business prevented the 1964 transaction from being a sale for tax purposes. It is at the outset clear that prior to the Clay Brown case there was no principle of tax law which disqualified a bona fide transfer from constituting a sale solely because of an indefinite and productivity-contingent purchase price. In cases arising in numerous contexts it has been held that such transfers were sales. In 1931, the Supreme Court held in Burnet v. Logan,283 U.S. 404 (1931), that when corporate stock was sold for a cash down payment and further payments depending on the indefinite *395 number of tons of ore mined during the remaining 86-year term of a lease, the transfer "was a sale of stock--not an exchange of property," even though there was no guaranteed maximum or minimum production. "The consideration for the sale was $2,200,000 in cash and the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty," 283 U.S. at 413. Since Burnet v. Logan was decided, myriad cases in numerous fields have held that transactions in which property was transferred for a consideration partially or wholly indefinite in amount, and dependent upon the subsequent productivity of the transferred asset, constituted sales for tax purposes just as they do for any other purposes. An early line of Supreme Court cases established that a variable price in the form of a royalty interest retained by a patent holder upon assignment to another of an exclusive right to manufacturer, use and vend a patented item does not affect the absolute nature of the assignment. Waterman v. Mackenzie,138 U.S. 252 (1891); Rude v. Westcott,130 U.S. 152 (1889); Littlefield v. Perry,88 U.S. 205 (1875). *396 These cases dealt with the question of standing to use for infringement--the distinction being that an assignee is entitled to bring suit whereas a licensee is not. In Rude v. Westcott the Supreme Court expressly addressed itself to the variable price question: * * * The concluding provision, that the net profits arising from sales, royalties, or settlements, or other source, are to be divided between the parties to the assignment so as to give the patentee one fourth thereof, does not, in any respect, modify or limit the absolute transfer of title. It is a provision by which the consideration for the transfer is to be paid to the grantor out of the net profits made * * *. 130 U.S. at 162-163. Tax cases in the patent field also support the general principle that a price dependent upon the future productivity of the transferred asset is consistent with a sale. United States v. Carruthers,219 F. 2d 21 (C.A. 9, 1955); Hofferbert v. Briggs,178 F. 2d 743 (C.A. 4, 1949); Commissioner v. Celanese Corp.,140 F. 2d 339 (C.A. D.C. 1944), affirming a Memorandum Opinion of this Court; Commissioner v. Hopkinson,126 F. 2d 406 *397 (C.A. 2, 1942), affirming 42 B.T.A. 580 (1940). We first considered a variable price patent assignment in Edward C. Myers,6 T.C. 258 (1946). There a patent holder sold exclusive patent rights to a manufacturer in exchange for a royalty based upon gross sales proceeds (less trade discounts). We held that the transaction constituted a sale and that any gain realized by the taxpayer was taxable at capital gain rates. Respondent initially acquiesced in the Myers decision, 1946-1 C.B. 3, and then, in 1950-1 C.B. 7, substituted his non-acquiescence. Finally in 1958, following repudiation by the legislature through enactment first of section 1235, Internal Revenue Code of 1954, and then of section 117(g) of the 1939 Code, and defeats in Roy J. Champayne,26 T.C. 634 (1956), and Leonard Coplan,28 T.C. 1189 (1957), respondent withdrew his non-acquiescence. Rev. Rul. 58-353, 1958-2 C.B. 408. See also Rose Marie Reid, 26 T.C. 622 (1956); Carl G. Dreymann,11 T.C. 153 (1948); Kimble Glass Co.,9 T.C. 183 (1947). *398 In the related area of assignment of copyright interests, respondent also originally refused to treat variable price transactions as sales. Rev. Rul. 54-409, 1954-2 C.B. 174. But in Rev. Rul. 60-226, 1960-1 C.B. 26, respondent announced that in view of (1) the similarity between copyright transactions and patent transactions; (2) the decisions of the Tax Court in the Myers,Champayne and Coplan cases; and (3) its own position in Rev. Rul. 58-353, he would abandon his previously announced position. One case holding that a variable price transfer of a copyright interest is a sale is Stern v. United States,164 F. Supp. 847 (E.D. La. 1958), affirmed percuriam,262 F. 2d 957 (C.A. 5, 1959), certiorari denied, 359 U.S. 969 (1959). There are other cases involving disposition of corporate stock for variable prices where the courts have recognized a sale or exchange. We have already cited Burnet v. Logan,supra. See also, Nordberg Mfg. Co. v. Kuhl,166 F. 2d 331 (C.A. 7, 1948); Estate of Raymond T. Marshall,20 T.C. 979 (1953); *399 George James Nicholson,3 T.C. 596 (1944). There are also cases involving the sale of partnership interests which hold that a variable purchase price is not inconsistent with a sale for tax purposes. McClennen v. Commissioner,131 F. 2d 165 (C.A. 1, 1942), affirming 46 B.T.A. 35 (1942); Pope v. Commissioner,39 F. 2d 420 (C.A. 1, 1930), affirming 14 B.T.A. 584 (1928); Hill v. Commissioner,38 F. 2d 165 (C.A. 1, 1930), affirming 14 B.T.A. 527 (1928), certiorari denied 281 U.S. 761 (1930). In addition, numerous cases have held that transfers of businesses, franchises and other income producing properties in exchange for payment of a variable productivity-based price constituted sales for tax purposes. Ayrton Metal Co., Inc. v. Commissioner,299 F. 2d 741 (C.A. 2, 1962), affirming in part and reversing in part 34 T.C. 464 (1960); Gant v. Commissioner,263 F. 2d 558 (C.A. 6, 1959), affirming a Memorandum Opinion of this Court; Commissioner v. Remer,260 F. 2d 337 (C.A. 8, 1958), *400 affirming 28 T.C. 85 (1957); Vermont Transit Co., Inc. v. Commissioner,218 F. 2d 468 (C.A. 2, 1955), affirming 19 T.C. 1040 (1953), certiorari denied 349 U.S. 945 (1955); Sevremes v. United States,209 F. Supp. 837 (W.D. Ky., 1962); Jones v. United States,96 F. Supp. 973 (D. Colo., 1951), affirmed 194 F. 2d 783 (C.A. 10, 1952). We conclude that prior to Clay Brown it was clear that the existence of a variable price contract does not preclude a sale for tax purposes, where the transaction is bona fide, the price and terms are within a reasonable range and control of the asset is transferred to the buyer. Indeed, the Code itself recognizes the possibility of a variable price contract of sale. Section 1235, for example, provides that a qualifying transfer of all substantial rights to a patent may be considered a sale even though the purchase price may be payable periodically over the useful life of the patent or may be contingent on productivity or use. Section 1235(a). Section 483, providing that a portion of deferred sales proceeds shall be treated as interest, specifically *401 covers sales proceeds which are indefinite as to time, liability and amount. Section 483(d). And see section 1253. Notwithstanding the above-cited authorities, respondent appears to contend that the Supreme Court's opinion in Clay Brown precludes us from continuing to hold in appropriate cases that a variable or contingent element does not disqualify a bona fide transfer from constituting a sale. Respondent relies on the Supreme Court's quotation therein of an earlier non-tax case's definition of a sale as "a transfer of property for a fixed price in money or its equivalent." 380 U.S. at 571, quoting Iowa v. McFarland,110 U.S. 471, 478 (1884). We do not, however, read the Clay Brown opinion as intended, even in dictum, to stand for the proposition that a fixed price is a prerequisite of a sale for tax purposes. The Court concurrently cited another earlier judicial definition of a sale which made no mention of this element. 380 U.S. at 571. Neither in the Clay Brown opinion itself nor in the earlier cited opinions was there involved the question whether a variable price is inconsistent with a sale. In Clay Brown, the *402 Supreme Court noted, 380 U.S. at 577, fn. 8, that respondent's position in Rev. Rul. 58-353, supra, and Rev. Rul. 60-226, supra, (both dealing with productivity-contingent prices) was inconsistent with his position in Clay Brown.It is likewise inconsistent with respondent's position here. The footnote thus appears inconsistent with the hypothesis that in Clay Brown the Supreme Court intended to preclude the possibility of a contingent price sale for tax purposes. See Note, 80 Harv. L. Rev. 455, 457 (1966). Even more persuasive is the Supreme Court's strong emphasis on the principle that generally speaking, what would be a sale in the ordinary understanding of the term would also be a sale for tax purposes. "A 'sale,' however, is a common event in the non-tax world; and since it is used in the Code without limiting definition and without legislative history indicating a contrary result, its common and ordinary meaning should at least be persuasive of its meaning as used in the Internal Revenue Code." 380 U.S. at 570-571. We believe that while Clay Brown involved a fixed price, the common understanding *403 of the term "sale" includes various partially or entirely contingent price arrangements. The terminology of "sale" universally used in the above-cited line of cases adequately demonstrates that understanding. E.g.,Burnet v. Logan,supra.We cannot find in the language of Clay Brown any convincing indication of an intent to overturn this well-established understanding. We do not, of course, hold that every contingent price contract is a sale for tax purposes. See, e.g.,Moberg v. Commissioner,365 F. 2d 337, 339 (C.A. 5, 1966), affirming a Memorandum Opinion of this Court; United States v. Wernentin,354 F. 2d 757 (C.A. 8, 1965); Knollwood Memorial Gardens,46 T.C. 764 (1966); Kolkey,supra. Each case must be scrutinized on its own facts. We merely reaffirm our numerous previous holdings that contingency of price alone does not preclude otherwise appropriate sale treatment. On the facts, we hold the 1964 transaction was a sale for tax purposes, as well as general law purposes, even though above the agreed $900,000 minimum the price was variable and contingent upon *404 the profitability of the business. There is no dispute that the seller met the other prerequisites for long-term capital gain treatment. The stocks were capital assets in the sellers' hands, and the holding period exceeded six months. The Allens, accordingly, correctly reported the character of their gains as longterm capital gains. 2. The 1968 Transaction.
In 1968 the Allens sold to National Homes all their rights and interest in the contract derived from the sale of their corporate stock to the Bishop in 1964. The consideration received by them consisted of $2,475,000 cash, a note for $525,000 which Ray Allen subsequently used to discharge the major part of a $530,000 debt he owed to Sportcraft Homes, and 29,070 shares of stock of National Homes. The Allens paid Bernstein 9,500 shares as a commission, 18,747 were placed in escrow, and 823 were delivered to the Allens. The escrow was to secure National Homes against any claims against it or Sportcraft Homes. In 1969, all of the stock, including the stock in escrow, was sold. On their 1968 joint Federal income tax return the Allens reported as long term capital gain the total amount of $3,000,000 received from National Homes. *405 The stock of National Homes received by the Allens was not reported as income. On the return, however, was a statement informing the government that the reported $3,000,000 gain on the sale to National Homes "[excludes] common stock of purchaser subject to restrictions on marketability, majority of which is held in escrow." Respondent contends that: (a) all consideration received by the Allens in the 1968 transaction with National Homes is taxable as ordinary income rather than capital gains; (b) in the alternative, the $525,000 note received constitutes ordinary income; (c) in any event, the escrow should be disregarded and the fair market value of all the National Homes stock received by the Allens is taxable to them in 1968; and (d) at least the 823 shares received but not placed in escrow is includible in their 1968 income. We reject all but the last of respondent's contentions. Respondent first contends that at the conclusion of the 1964 transaction the Allens held merely a right to receive ordinary income, which right was not a capital asset, and that the assignment of this right did not constitute a sale or exchange but rather a termination of this right. However, we *406 have previously concluded that what the Allens held at the conclusion of the 1964 transaction was the right to receive sales proceeds, which are reportable as capital gains. We see no reason to hold that their character for tax purposes is transmuted to ordinary income by an assignment, nor has respondent cited to us any authority so holding. Anticipated proceeds of the sale of a capital asset, even if viewed as an asset newlysold independently from the originally transferred property, do not fall literally within any of the exclusions from the category of a "capital asset" in section 1221. Indeed, the language of section 1221(4), excluding amounts receivable from a sale of section 1221(1) property from the category, inferentially leaves therein receivables from sales of capital assets. Accordingly, whether we view the character of the gain as derivative from or independent of the character of the gain on the original transaction, we conclude that payments received for the Allens' assignment to a new buyer of their rights to future long-term capital gains are likewise reportable as capital gains. Respondent's cited cases are inapposite to the facts and law as found by this Court. *407 Next, respondent argues that the $525,000 note received by the Allens from National Homes, and applied in payment of their indebtedness to Sportcraft Homes, constitutes ordinary income in the nature of "forgiveness of indebtedness." But Sportcraft Homes did not cancel or forgive the debt without consideration. Part of the consideration paid to the Allens by National Homes was a demand note for $525,000. In the contract of sale National Homes agreed that Sportcraft Homes (all the stock of which was to be acquired by National Homes) would accept National Homes' note pro tanto in discharge of the Allens' indebtedness to Sportcraft Homes. Even assuming that the Allens were indebted to National Homes instead of Sportcraft Homes, and sold property to National Homes, and that part of the consideration to the Allens was the cancellation of the indebtedness, the amount thereby realized by the Allens would still be an amount received on the sale or exchange of property. Likewise, under the facts here (the sale of property in exchange for National Homes' note), the note was consideration for the sale of property and was so reported on the Allens' income tax return, and not ordinary income. There *408 was apparently no reason to regard the note as worth less than its face value, nor does respondent so contend. Accordingly, the note having been properly taken into the Allens' gross income at par, the Allens enjoyed no further gain when they applied the note at par to pay their debt. Next, respondent argues that the escrow should be disregarded and the fair market value of all the National Homes stock received by the Allens is taxable to them in 1968, or, at the least, the 823 shares received but not placed in escrow is includible in their 1968 income. Respondent relies upon the doctrine of constructive receipt in urging this Court to disregard the escrow. However, it is well settled that an escrow created for valid purposes will not be disregarded under the constructive receipt doctrine. E.g.,McLaughlin v. Commissioner,113 F. 2d 611 (C.A. 7, 1940), reversing a Memorandum Opinion of this Court; Warren Jones Co.,60 T.C. 663 (1973); Harold W. Johnston,14 T.C. 560 (1950). Only if the agreements between the purchaser and the seller were "mere subterfuge and sham so that petitioner could postpone * * * income tax to another *409 year" will the result that respondent proposes obtain. Margaret L. Carpenter, 34 T.C. 408, 416 (1960).
The escrow herein was created at National Homes' insistence for the very real purpose of protecting itself from liability of exactly the sort now claimed by respondent in the present proceeding. It was a valid escrow, the contingencies were real, and the stock placed in the escrow was not includible by the Allens in their gains on sale while the escrow continued. See Marion H. McArdle,11 T.C. 961 (1948). The sellers' rights in the escrowed shares had no readily ascertainable fair market value until the contingency was resolved and it could be determined how many of the shares would ultimately come into sellers' unrestricted possession. Burnet v. Logan,supra.
We agree with respondent that the National Homes stock received by the Allens can be valued, and that those shares not held in the escrow were immediately includible in the Allens' income. We reject the Allens' contention that the shares cannot be valued merely because they were unregistered legended stock. We accept respondent's expert's valuation of the National *410 Homes stock, namely, $20 per share on August 28, 1968. Therefore we grant the Allens' request to amend their petition to claim an overpayment for 1969, the year in which they sold the 823 shares they held outside the escrow and reported the gain thereon. 3. Rent Deductions.
Respondent argues that petitioner Sportcraft Homes is not entitled to a rent deduction because the so-called rent was not paid for the use of property. We disagree. The lease transaction involved in this proceeding was not so distinctive as to place it in a separate category from all others. While the lease was sophisticated, it was not so unusual as to warrant a conclusion that it was not what it appeared to be. Leases identical in most respects to the one now under consideration were employed in several other cases considered by this Court and were either recognized as leases by this Court or conceded to be such by respondent on appeal. Warren Brekke,40 T.C. 789 (1963), holding rent not deductible, reversed and remanded by stipulation of the parties (C.A. 9, March 25, 1966) [see 35 P-H Memo. T.C. par. 66,208, 25 T.C.M. 1063 (1966) where respondent concedes this issue]; *411 Royal Farms Dairy Co.,40 T.C. 172 (1963), disallowing part of rental deduction, reversed and remanded pursuant to a stipulation allowing full rental deduction (C.A. 9, Oct. 18, 1965), and appeal dismissed (17 A.F.T.R. 2d 356, 66-1U.S.T.C. par. 9296 (C.A. 9, 1965)); Anderson Dairy, Inc.,39 T.C. 1027 (1963), allowing full rental deduction, appeal dismissed pursuant to stipulation (C.A. 9, Sept. 22, 1965); Est. of Sol Goldenberg, a Memorandum Opinion of this Court (33 P-H Memo. T.C. par. 64,134, 23 T.C.M. 810 (1964)) where part of rent deduction disallowed, reversed and remanded pursuant to stipulation of parties allowing full rental deduction subnom.Golden West Rubber Products, Inc. v. Commissioner, 66-1 U.S.T.C. par. 9297 (C.A. 9, 1965); Oscar C. Stahl, a Memorandum Opinion of this Court (32 P-H Memo. T.C. par. 63,201, 22 T.C.M. 996 (1963)), allowing full deduction of rent, appeal dismissed pursuant to stipulation (C.A. 9, Aug. 13, 1965), certiorari denied 379 U.S. 836 (1964); Isis Windows, Inc., a Memorandum Opinion of this Court (32 P-H Memo. T.C. par. 63,176, 22 T.C.M. 837 (1963)), *412 allowing full deduction of rent, appeal dismissed (C.A. 9, Sept. 1, 1965). In other words, in not one of the numerous cases to date involving a three-cornered bootstrap sale to an exempt organization has the operating company ultimately been denied any part of the rental deduction. See University Hill Foundation,51 T.C. 548, 570, fn. 20 (1969), reversed on other grounds 446 F. 2d 701 (C.A. 9, 1971), certiorari denied 405 U.S. 965 (1972). Furthermore, the provisions in the Lease viewed with most suspicion by respondent are commonly found in standard leases. Frequently leases are subordinated to obligations of the lessor; in percentage leases, the lessor is usually concerned about the credit and reputation of the lessee's stockholders and officers and may demand the right to approve them just as he demands the right to approve the lessee's assignees; lessees are frequently permitted to make improvements, with the lessor's approval, which inure to the lessor's benefit and reduce their rent by the cost thereof; and percentage leases based upon net income, while risky, are not uncommon. See University Hill Foundation,supra at 569; *413 McMichael and O'Keefe, Leases: Percentage, Short and Long Term, 32-64, 151-224 (5th Ed., 1960); and 10 Rabkin and Johnson, Current Legal Forms with Tax Analysis, Forms 23.07 (4) and (5), and Form 23.34. Despite the fact that nowhere in the statute is there any requirement that the rent paid be reasonable (if it is rent), respondent has asserted that the rent was unreasonably high. In pursuit of this assertion he put on two valuation experts whose testimony is unhelpful, even assuming reasonable rent were an issue, because both totally disregarded the terms of the Lease. For example, neither took into account that the rent was dependent upon the net profits of the business and neither attempted to place a rental value on the intangible assets of a going business. Among the intangibles which Sportcraft Homes obtained under the Lease were trade names, plans and drawings, established dealer relations and customer lists, the location of the plants, and a trained labor pool and qualified supervisors. Moreover, for what they procured for Sportcraft Homes, the rental payments were in our opinion reasonable. Sportcraft Homes was presented with a good *414 business opportunity for substantial profits at low risk to it. Its required capital investment was minimal, putting it in no position to bargain for a lower rental. Sportcraft Homes paid a tax on its profits. It would probably have been impossible for it to earn any greater profit with the capital which it had. It was therefore acting with very sound business judgment in paying the required rental. Again in the light of hindsight, the net result for the lessee was to parlay an initial investment of $12,300 over four years into assets worth approximately $114,000. Sportcraft Homes was scarcely victimized by being charged unreasonable rentals for what it received. There is no legitimate reason to deny it a deduction for the rental expense it was fairly required to pay. The respondent's next argument is that Sportcraft Homes is in any event not entitled to deduct rent accrued but not paid to the Bishop within 2-1/2 months following the close of its taxable year. Section 267 provides that no deduction shall be allowed to an accrual basis taxpayer for amounts owed to a related cash basis taxpayer unless such amounts are paid within 2-1/2 months following the close of the accrual basis *415 taxpayer's fiscal year. The required relationships between the taxpayers are set out in section 267(b). Since the petitioner, Sportcraft Homes, is a corporation, the requisite relationship between it and the lessor must fall within one of the following provisions of section 267(b): (b) Relationships.--The persons referred to in subsection (a) are: * * * * * (2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual; (3) Two corporations more than 50 percent in value of the outstanding stock of each of which is owned, directly or indirectly, by or for the same individual, if either one of such corporations, with respect to the taxable year of the corporation preceding the date of the sale or exchange was, under the law applicable to such taxable year, a personal holding company or a foreign personal holding company; * * * * * (8) A fiduciary of a trust and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for the trust or by or for a person who is a grantor of the trust; * * * * * The leased *416 assets were owned by one of the following three persons or entities: the Catholic Diocese of Austin (i.e., the Roman Catholic Church); Bishop Reicher in his individual capacity; or the Bishop Reicher Trust. The record does not make it clear in what capacity Bishop Reicher was in fact acting when he took title to the purchased stock. Since none of the above entities is, or is claimed to be, a personal holding company, section 267(b)(3) is not applicable. The Catholic Diocese of Austin is not an individual. But even assuming it were so classified for purposes of section 267(b)(2), Sportcraft Homes was not an agency or instrumentality of the Roman Catholic Church. The Bishop Reicher Trust contained a prohibition against loans to the Roman Catholic Church or its agencies or instrumentalities at interest rates in excess of the prime rate at the Federal Reserve Bank in Dallas. However, when the Trust loaned $600,000 to Sportcraft Homes on March 4, 1965, it charged interest at the rate of 7-1/2 percent. The Dallas Federal Reserve prime rate at that time was about 5 percent, and the Trust had borrowed the $600,000 from the City National Bank in Austin at 5-3/4 percent. Obviously the *417 trustees of the Trust did not consider Sportcraft Homes to be an agency or instrumentality of the Roman Catholic Church. We agree with the trustees that it was not such an agency or instrumentality. Assuming that Bishop Reicher in his individual capacity owned the leased assets, the requisite relationship between him and Sportcraft Homes is lacking. The corporate stock book and minute book, and the uncontradicted testimony of Johnson, Nash and Bode, all show that Johnson, Nash and Bode owned all the outstanding stock of the corporation during the years in issue. Further, they managed the corporation without interference, subsequently sold the stock at a substantial profit and kept the proceeds. Finally, even if the Bishop Reicher Trust owned the leased assets, section 267 cannot apply. Neither the Trust nor its settlor, Bishop Reicher, owned any interest in Sportcraft Homes. Such common ownership must exist before section 267 can apply. 4. Runaway Bay Club.
Respondent disallowed certain expenses claimed by the Allens in connection with their cash-basis business, known as the Runaway Bay Club, as shown on Schedule C to their 1968 return. The disallowances arose from a series *418 of book entries subsequently made by Wolf & Company, auditors, to correct prior accounts erroneously kept on the accrual basis. Respondent systematically accepted each such adjustment which increased tax liability and rejected each such adjustment which did not. Respondent claims that the Allens have not proved that the disallowances were in error. The Allens argue that the respondent's actions were arbitrary. The Allens also claim they are entitled to an increased net operating loss for the Runaway Bay Club for 1968. The Allens have carried their burden of proof to our satisfaction with the testimony of their expert, James Ohlman. We have no reason to doubt that the extensive audit performed by Wolf & Company and giving rise to the recomputed loss was fair and proper, and respondent has not convinced us otherwise. We hold that the Allens are entitled to the claimed increased net operating loss for the Runaway Bay Club for 1968. Respondent also disallowed all expenses associated with the operation of boats at the Runaway Bay Club for 1968 and 1969 on the grounds that the boats were owned and operated for the Allens' personal use. We have found as a fact that the boats were not *419 owned or operated for the Allens' personal use, but were owned and operated by the Club for boat rental and water skiing. Expenses for interest, insurance and depreciation on the boats are therefore deductible for 1968 and 1969. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. The Court ordered seriatim briefs. In disregard of the Court's order, respondent prepared his findings of fact "in the manner of concurrent briefs." He made no effort to comply with Rule 151(e) [formerly Rule 35(e) (3)]. Instead of setting forth his objections, together with the reasons therefor, to petitioners' proposed findings, he merely filed counterfindings or alternative findings. This was one of numerous acts of respondent which disregarded specific rulings of the Court and impeded rather than assisted the Court in deciding this case.↩
3. This plant burned down in December 1963, which resulted in the company's being unproductive and having a loss for this period; thereafter a new plant was built and its operation was highly successful.↩
*. The rental payments for these years are not in issue.↩
***. The record does not establish the dates on which the cash payments were made.↩
**. These years are not in issue. ↩
*. These years are not in issue.↩
4. The results of this two month period, if annualized, would result in taxable income of approximately $135,000.↩
5. The number of shares actually received by the parties in interest and placed in escrow was adjusted to reflect the changed market value of the stock as provided in the August 12th Agreement.↩
6. We have recently been reversed by the Court of Appeals for the Second Circuit, with instructions on remand to treat the transaction as a sale to the extent of a reasonable price. F. 2d (1974).↩
7. Full payment was to be made within 10 years in all events, but would be due earlier if earnings sufficed.↩